**Cynthia DORTZ, Plaintiff,**

v.

**The CITY OF NEW YORK, New York City Health and Hospitals Corporation, Mt. Sinai Hospital, and Elmhurst Hospital, Defendants.**

**No. 92 Civ. 9202 (PKL).**

United States District Court, S.D. New York.

Oct. 5, 1995.

Janice Goodman, Loren Gesinsky, New York City, for plaintiff.

David L. Lock, Assistant Corporation Counsel, The City of New York Law Department, New York City, for defendants.

### MEMORANDUM ORDER

LEISURE, District Judge:

Defendants have submitted objections to the Report and Recommendation (the "Report") prepared by the Honorable Theodore H. Katz, United States Magistrate Judge, pursuant to the referral of this Court. The Court has reviewed Judge Katz's Report, and made a *de novo* determination, as required by 28 U.S.C. § 636(b)(1), that Judge Katz's exhaustive, well-reasoned Report is legally correct and proper. *See United States v. Raddatz*, 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980) ("[Section 636(b)(1) ] permit[s] whatever reliance a district judge, in the exercise of sound judicial discretion, [chooses] to place on a magistrate's proposed findings and recommendations."). In addition, the Court has considered defendants' objections and finds them to be without merit. The Court therefore adopts the Report in its entirety.

Accordingly, for the reasons stated by Judge Katz in the Report, defendants' motion for summary judgment is HEREBY GRANTED with respect to Plaintiff's retaliation claim involving the Elmhurst Hospital Human Resources Department, and is HEREBY DENIED in all other respects.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

KATZ, United States Magistrate Judge.

This employment discrimination action, brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5, and § 296 of the New York State Human Rights Law ("HRL"), was referred to me by your Order of Reference for general pre-trial supervision and disposition of substantive motions, in accordance with 28 U.S.C. § 636(b)(1)(A) and (B). Plaintiff alleges that Defendants discriminated against her on the basis of her gender by engaging in sexual harassment, and retaliated against her for participating in activity protected under Title VII and HRL § 296. Pre-trial discovery has been completed and Defendants have moved for summary judgment, pursuant to Rule 56, Fed.R.Civ.P. For the reasons set forth below, I recommend that the Defendants' motion be denied in all respects, except as to Plaintiff's retaliation claim involving the Elmhurst Hospital Human Resources Department.

### BACKGROUND

Cynthia Dortz, a certified social worker, was employed by the New York City Health and Hospitals Corporation ("HHC") as Assistant Director of Social Work Services in the Alcohol Treatment Program ("ATP") at Elmhurst Hospital Center. (Defendants' Notice of Motion, dated January 14, 1994, Ex. A ["Defs.Ex. A"]; Dortz Affidavit ["Dortz Aff."], dated February 7, 1994, ¶ 4.) Dortz had worked in the ATP since 1972 as a supervisor of social work, prior to being promoted to the position of Assistant Director in 1983. (Dortz Aff. ¶¶ 1–2.)

Elmhurst is operated by HHC, a public benefit corporation established pursuant to state law. See N.Y.Unconsol.Law §§ 7381, et seq. Under an affiliation agreement, Mt. Sinai School of Medicine of the City University of New York ("Sinai"), an educational corporation chartered by the New York State Board of Regents, generally provides for the delivery of medical services at Elmhurst. (Defs.Exs. D and E.)

As of July of 1990, the ATP operated under the auspices of Elmhurst's Department of Psychiatry. (Deposition Transcript of Dr. Ann Marie Sullivan, dated July 29, 1993 ["Sullivan Depo."], at 22.) Dr. Sullivan, a Sinai employee, was the Director of the Department. (Sullivan Depo. at 7.) Plaintiff's direct supervisor was Dr. Lawrence Cuzzi, also a Sinai employee, who was Director of Social Work Services for Elmhurst. (Deposition Transcript of Lawrence Cuzzi, dated September 9, 1993 ["Cuzzi Depo. II"], at 165.)

On October 29, 1990, Dr. Robert Levengood, a psychiatrist and Sinai employee, commenced employment at Elmhurst as Medical Director of the Division of Chemical Dependence Services, which is part of the Department of Psychiatry. (Defendants' 3(g) Statement, dated January 14, 1994 ["Defs. 3(g)"], ¶ 8; Sullivan Depo. at 74.) Levengood was responsible for the clinical, medical, and psychiatric components of the Division of Chemical Dependence Services, including the ATP. (Defs.Ex. G.) Levengood reported directly to Sullivan. (Defs.Ex. G.) By virtue of his position, Levengood was required to collaborate with Dortz and communicate with her to ensure the efficient functioning of the ATP. (Deposition Transcript of Pedro Velez, Executive Director of Elmhurst, dated September 23, 1993 ["Velez Depo."], at 55.) According to Dortz, Levengood had supervisory control over her work. (Plaintiff's 3(g) Statement, dated February 11, 1994 ["Pl. 3(g)"], § B ¶ 1; Dortz Aff. ¶ 4.)

### I. Sexual Harassment

The incidents giving rise to Dortz' sexual harassment claim began shortly after Levengood commenced his employment. They were subsequently documented in memoranda by Plaintiff and five members of her staff in December of 1990 and January of 1991, all of which are annexed as exhibits to this motion. See Defs.Exs. J–P.

From the inception of Levengood's employment, he was critical of Dortz and procedures in the ATP, and shunned Dortz' repeated efforts to reach out to him. In particular, Joyce Richardson, a certified social worker whom Dortz supervised, reported that on November 13, 1990, Levengood asked "if something happens to Cynthia, would you

want her job?" (Defs.Ex. O.) When Levengood and Dortz had their first meeting alone, on November 15, 1990, Levengood stated to Dortz, "This could develop into a sado-masochistic relationship, but I am not going to let it happen." (Defs.Ex. P; Dortz Aff. ¶ 10.) At a meeting with the ATP staff several days later, Levengood stated, "quality assurance is looked at by you folks around here like venereal warts." (Defs.Ex. P.) At one point, Levengood stated, in response to a question from Dortz: "You talk like my children when they give me reasons why something can't be done." (Dortz Aff. ¶ 10.)

According to Marge Heller, an ATP counselor whom Dortz supervised, later that month Levengood commented to her, "Cynthia probably wears black leather on weekends, with a black leather mask!" (Defs.Ex. M.) During the last week of November or early December, in the presence of Joseph Grabarnick, an ATP staff member, Al Brockway, an ATP counselor who was supervised by Dortz, and Marge Heller, Levengood grabbed his stomach as if in pain, and stated, "ugh, ugh, this is Cynthia sticking pins in her voodoo doll." Then he turned to Susan Kleinrock (another ATP staff member) and said "you know what I mean." (Defs.Exs. J, K, M, and P.) On another occasion, Levengood said to Joseph Grabarnick, "It's like your hands are tied, bend over and let me fuck you up the ass." (Defs.Ex. K.)

On December 6, 1990, Levengood shouted at Dortz, at a meeting with other ATP staff members, "I'm not psychotic! You are passive-aggressive!" (Defs.Ex. P; Dortz Aff. ¶ 11.) Approximately one week later, Penny Laitin, the ATP staff supervisor of the vocational program, told Dortz that Levengood was "badmouthing" her with members of her staff. (Defs.Ex. P; Dortz Aff. ¶ 13.) Laitin said that Levengood was telling the staff of his fantasy of Dortz in black leather.

(Defs.Ex. P; Dortz Aff. ¶ 13.) She informed Dortz that Levengood stated that he "would like to pull Cynthia's hair out of her head. I could shit on her neck!" (Dortz Ex. P; Dortz Aff. ¶ 13.)

According to Al Brockway, Levengood called Dortz a "frustrated bitch" on numerous occasions. (Defs.Ex. N.) For example, on December 1, 1990, Levengood called Dortz "the frustrated bitch social work supervisor and that she had better shape up or else...." (*Id.*) The following week, Levengood engaged in conversation that Brockway described as "sexually explicit" and included derogatory remarks that "took on the atmosphere of a stag party," some of which were directed against Dortz, including "Cynthia Dortz is queer, asexual, needs a good fucking, but [I] wouldn't touch her with someone else's dick ... she's probably a lesbian!" (*Id.*)[1]

On December 14, 1990, after Plaintiff reported these incidents to Dr. Cuzzi, he held a meeting attended by 10 or 11 members of the ATP social work staff. (Defs.Ex. H; Dortz Aff. ¶¶ 16–17.) The staff members corroborated Dortz' complaints and expressed concerns about Levengood's conduct, particularly that comments about Dortz made them feel personally and professionally uncomfortable. (Defs.Ex. H; Dortz Aff. ¶ 17.) Cuzzi requested that those with personal knowledge communicate their concerns in writing, which was done by five members of the ATP staff. (Defs.Exs. J–O.)

Cuzzi testified at his deposition that, soon after having learned about Plaintiff's concerns, he reported the allegations to the following people: Judith Alvarez, the EEO Officer at Elmhurst charged with the responsibility of investigating allegations of discrimination;[2] Fred Horan, the Elmhurst Senior

---

1. In addition, Plaintiff claims that Levengood made another remark, reported by Thea Gbur, a social worker whom Plaintiff supervised. Gbur claims that, on November 27, 1990, Levengood called a patient a "fat boy" who "probably sat around shooting people while he masturbated," and that the patient "really liked [Thea Gbur]" and "would walk over hot coals." (Defs.Ex. L.) Memoranda by Dortz' staff indicate that Levengood made hostile, derogatory comments about Dortz to the staff on numerous occasions other

than those recounted above. (Defs.Ex. N; Dortz Aff. ¶ 13.) Plaintiff also alleges that Levengood was physically threatening to her and became enraged and appeared to be out of control when he screamed at her. (Dortz.Aff. ¶¶ 10 and 11.)

2. Contrary to Cuzzi's testimony, Alvarez stated at her deposition that she had no recollection of Cuzzi having informed her of Dortz' complaint, and believes that Cuzzi did not contact her about

Administrator responsible for the functioning of the ATP; and, Gary O'Gwyn, Elmhurst's Chief Operating Officer. In addition, he later reported the allegations to Dr. Gary Rosenberg, Chair of the Social Work Department at Sinai. (Cuzzi Depo. II at 183–185, 201, 291–292.) Despite HHC policy requiring that the EEO officer investigate any reports of sexual harassment (*see* Deposition of Judith Alvarez, dated September 15, 1993 ["Alvarez Depo."], at 29–30), none of the above individuals participated in any investigation of the charges until they received notification of Dortz' EEOC complaint approximately two months later.

Cuzzi also spoke with Dr. Sullivan, and told her of the December 14 meeting with the ATP staff. Sullivan spoke with Levengood, at which time he denied having made certain statements and claimed that he was misunderstood. (Sullivan Depo. at 96–98; Defs.Ex. I.) Sullivan told Levengood that vulgar or coarse language was not acceptable and that such language should not be used. (Sullivan Depo. at 98.) Without speaking with anyone other than Levengood, Sullivan determined that Levengood had been misunderstood. (Sullivan Depo. at 93.) Sullivan stated at her deposition, "I generally, I just, my impression was that I believed him." (Sullivan Depo. at 87.) She told Levengood to avoid speaking with Dortz unless a witness was present, so that he would be protected from any misunderstandings in the future. (Sullivan Depo. at 93.) Dortz requested a meeting with Sullivan to discuss the allegations, but Sullivan refused to meet with her, purportedly stating that everything was under control. (Cuzzi Depo. II at 234–235; Dortz Aff. ¶ 18.)

Cuzzi also spoke with Levengood about the allegations in general terms, but he never confronted Levengood about the specific statements Levengood allegedly made, because Levengood was considered to be higher in the hospital hierarchy. (Cuzzi Depo. II at 211–12.) Cuzzi testified at his deposition, "I didn't have any authority or any power to do anything.... I didn't ask him [about the allegations. (Deposition of Judith Alvarez, dated September 15, 1993 ["Alvarez Depo."], at

specific allegations] because I didn't feel it was my place to ask him." (Cuzzi Depo. II at 212.)

Dortz brought continuing complaints to Cuzzi many times. (Dortz Aff. ¶ 28; Cuzzi Depo. II at 203.) She wanted certain action taken: an apology from Levengood; documentation in Levengood's file; a reprimand; and termination. (Dortz Aff. ¶ 21.) The parties dispute whether Cuzzi attempted to address Dortz' concerns at those meetings or trivialize them. (Cuzzi Depo. II at 203; Dortz Aff. ¶ 28.) On one such occasion, on or about December 18, 1990, Plaintiff met with Cuzzi because she was frustrated that no one had responded to her complaints. (Dortz Aff. ¶ 19.) Cuzzi told her that if she pursued her complaints outside of the hospital, her entire sexual life would be disclosed and she would be required to confront Levengood, which would prevent them from being able to work together in the future. (Dortz Aff. ¶ 19.)

## II. *Acts of Retaliation*

Dortz alleges that, after she first complained to Cuzzi about Levengood, she experienced numerous acts of retaliation. (Dortz Aff. ¶ 24.) Prior to making her complaint, Dortz had never received a negative performance evaluation. (Dortz Aff. ¶¶ 8, 24; Exhibit B, annexed to Dortz Affidavit ["Dortz Aff.Ex. B"].) After the complaint, however, Cuzzi told her that Sullivan was complaining that she was an "obstructionist"; that she was "rigid"; and that she was not "cooperative." (Dortz Aff. ¶ 24.)

In addition, Dortz alleges that Levengood isolated her and undermined her authority with the ATP staff. (Defs.Ex. Y; Dortz Aff. ¶¶ 25–27.) In particular, he sent directives to Dortz, but he would not communicate with her about them; Levengood assigned Dortz' supervisees additional responsibilities and gave them directions without informing her; and, he excluded Dortz or failed to inform her of senior level meetings having a direct effect on her role and responsibilities, and those of her staff. (Defs.Ex. Y.)

29–30.)

Dortz immediately reported Levengood's conduct to Cuzzi; later, she also told Cuzzi that she felt that Levengood might physically harm her. (Cuzzi Depo. II at 203–204, 249.) He told Dortz that it was her responsibility to keep trying to enlist Levengood's cooperation (Cuzzi Depo. II at 204); he also told Dortz that her complaints were "petty," although he was surprised that Levengood had not responded to some of her memos. (Cuzzi Depo. II at 257–58, 303.)

Cuzzi never told Sullivan of Dortz' concerns about being isolated by Levengood. (Cuzzi Depo. II at 204.) Sullivan, in turn, had not told Cuzzi or Dortz of her instructions that Levengood avoid contact with Plaintiff unless other staff were present. (Cuzzi Depo. II at 204–05; Dortz Aff. at ¶ 29.) On May 2, 1991, Cuzzi told Dortz that Levengood's behavior "was a direct response to [her] filing the complaint." (Defs.Ex. Y.)

Dortz claims that she suffered physical and psychological trauma as a result of the harassment and acts of retaliation, including gastro-intestinal disorders and depression. (Dortz Aff. ¶¶ 34–35.) On May 5, 1991, she took a medical leave on the advice of her psychiatrist. (Dortz Aff. ¶ 37 and Exs. C and D.) On December 7, 1992, after a contested hearing, the Worker's Compensation Board found that Plaintiff suffered from a partial disability due to the alleged harassment. (Dortz Aff.Ex. I; Dortz Aff. ¶¶ 39–41.) The Worker's Compensation Board subsequently determined that Plaintiff's disability was permanent. (Dortz Aff.Ex. J.) After Plaintiff's medical leave was exhausted, on February 20, 1992, she permanently relinquished her position as Assistant Director of Social Work in the ATP. (Dortz Aff.Ex. D; Pl. 3(g) § B, ¶ 6; Defs.Ex. A.)

In connection with her medical leave, Dortz requested certain forms from the Elmhurst Personnel Department. According to Dortz, the department failed to provide her with the proper paperwork until December of 1991. (Deposition of Cynthia Dortz, undated ["Dortz Depo."], at 82; Complaint, dated December 18, 1992, ¶ 25.) Although she had not previously taken an extended medical leave, Dortz had never had any difficulty obtaining medical forms in the past. (Dortz Depo. at 82–83.) She believes that the personnel department knew of her sexual harassment complaint at the time they failed to provide her with the forms. (Dortz Depo. at 82.)

### III. *The Administrative Charge and Subsequent Investigation*

On January 31, 1991 Dortz filed a *pro se* complaint with the EEOC against HHC and Elmhurst, alleging gender discrimination. (Defs.Ex. Q; Dortz Aff. ¶ 43.) The charge was referred to the State Division of Human Rights. (Defs.Ex. Q.) At the end of February, Alvarez was notified of the charge and related to Dortz that there would be an investigation. (Defs.Ex. V.) Gloria Sierra, Associate Director of the Community Health Center at Elmhurst, conducted an investigation between March 8 and April 2, 1991. (Defs.Ex. W.) Without interviewing Dortz,[3] Sierra determined that there was inappropriate use of language on the part of Levengood, but concluded that his use of such language did not rise to the level of sexual harassment. (Defs.Ex. W.) Sierra wrote in a memo about the investigation that she was "unable to concretely substantiate the allegations" although "some of the allegations regarding inappropriate use of language were founded." (Defs.Ex. X.)

On June 3, 1991, Plaintiff amended her administrative complaint, *pro se,* to include a charge of retaliation on the part of Levengood. (Defs.Ex. Y.) The New York State Division of Human Rights ("State Division") subsequently held a fact-finding conference, in which Elmhurst and HHC participated as parties and Sinai representatives attended, although Sinai was not named as a respondent. (Defs.Ex. BB.) There were also conciliation proceedings, and Defendants conveyed settlement offers through Cuzzi. (Dortz Aff. ¶ 50). On March 5, 1992, the State Division found probable cause to believe that the Respondents had engaged in

---

**3.** Defendants claim that Alvarez interviewed Dortz, but Alvarez' file memo does not indicate that she did more than inform Plaintiff that there would be an investigation and to ask what Plaintiff wanted. (Defs.Ex. V.)

unlawful discriminatory practices. (Defs.Ex. Z.)

On March 20, 1992, Plaintiff, acting through counsel whom she had retained, moved to amend her complaint to add Sinai as a respondent. (Defs.Ex. AA.) On April 23, 1992, over Sinai's objection (Defs.Ex. BB), the State Division amended the administrative complaint to add Sinai. (Defs.Ex. CC.) Sinai did not appeal the ruling.

Plaintiff commenced the instant action on December 18, 1992, alleging that Defendants engaged in sexual harassment in violation of Title VII and HRL § 296, and retaliated against her for her participation in protected activity.

## DISCUSSION

### I. Subject Matter Jurisdiction

Apart from challenging the merits of the claims asserted in this action (see Discussion at pages 147–161, *infra* ), Defendants contend that the Court lacks jurisdiction over Plaintiff's claim against the Elmhurst Human Resources Department ("Personnel Department") for retaliation, and over her state claims against Elmhurst and HHC. These challenges are addressed in this section. In addition, Defendants argue that Sinai is not a proper defendant in this action—an issue which is addressed in the following section.

### A. Retaliation Claim Against the Elmhurst Personnel Department

■ Defendants contend that Plaintiff's allegations of retaliatory conduct on the part of the Human Resources Department of Elmhurst Hospital should be dismissed for lack of subject matter jurisdiction on the grounds that these claims, which were not identified in the administrative charge, are not reasonably related to the claims in Plaintiff's administrative charge. (Defs.Memo at 45–47.) Defendants rely upon the well-established rule that a district court has jurisdiction only over those claims included in an EEOC charge, *see* 42 U.S.C. § 2000e–5(e); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1972), or those that are "based on conduct subsequent to the EEOC charge which [are]

'reasonably related' to that alleged in the EEOC charge." *Butts v. City of New York,* 990 F.2d 1397, 1401 (2d Cir.1993); *see also Stewart v. United States Immigration & Naturalization Serv.,* 762 F.2d 193, 198 (2d Cir.1985); *Almendral v. New York State Office of Mental Health,* 743 F.2d 963, 967 (2d Cir.1984).

The Second Circuit has recognized several circumstances in which claims not alleged in an EEOC complaint are deemed to be reasonably related to conduct identified in a plaintiff's administrative charge. One such instance is where a plaintiff alleges retaliation by the employer for filing an EEOC charge. *Butts,* 990 F.2d at 1402. *See also Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1208 (2d Cir.1993) ("[w]e have held repeatedly that a complaint alleging employer retaliation against an employee who has opposed discrimination may be considered 'reasonably related' to allegations already raised with the EEOC.... [This rule] has been broadly construed to allow judicial redress for most retaliatory acts arising subsequent to an EEOC filing...." (citations omitted)); *Owens v. New York City Housing Auth.,* 934 F.2d 405, 410–11 (2d Cir.) (plaintiff's claim that defendant retaliated against her, by refusing to plea bargain disciplinary charges that were asserted against her, were reasonably related to initial age discrimination charge, since the retaliation claim grew out of actions plaintiff took in response to the earlier incident of discrimination), *cert. denied,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991). The rationale for allowing such an exception is to avoid requiring a plaintiff to file repeated administrative charges, which "could have the perverse result of promoting employer retaliation in order to impose further costs on plaintiffs and delay the filing of civil actions relating to the underlying acts of discrimination." *Butts,* 990 F.2d at 1402.

In the present action, Plaintiff has asserted a retaliation claim against the Elmhurst Personnel Department for conduct occurring after she filed her EEOC complaint in January of 1991, and conduct that continued beyond her EEOC amendment on June 3, 1991. In particular, Plaintiff has claimed that the

Personnel Department retaliated against her by withholding forms and information that she needed to process her medical leave. *See* Complaint ¶ 25, Dortz Depo. at 82–83. Plaintiff testified at her deposition that she had not encountered such intransigence from the Personnel Department prior to the time she filed her administrative charge. (Dortz Depo. at 83.)

■ It is reasonable to view this claim as stemming from the initial conduct Plaintiff alleged in her EEOC complaint, since she required medical leave as a direct result of the illness she suffered, allegedly due to Defendants' discrimination and harassment. Indeed, Plaintiff referred to her need to take a medical leave when she amended her EEOC complaint to include a charge of retaliation, stating, "[o]nce I reported sexual harassment, verbally and in writing, Dr. Levengood, by behaving in more subtle ways, made it so impossible for me to function on my job that I became sick and have had to take a medical leave (since 5/6/91), as recommended by my physician." (Defs.Ex. Y.) Since Plaintiff's retaliation claim against the Elmhurst Personnel Department flows from the initial conduct giving rise to the administrative charge, it is reasonable to view this claim as based on subsequent conduct which is "reasonably related" to that which was previously alleged in Plaintiff's EEOC charges, so as to allow for judicial redress.[4]

### B. *Plaintiff's State Claims against HHC and Elmhurst*

■ Defendants contend that they are entitled to dismissal of Plaintiff's state discrimination claims against HHC and Elmhurst arising under New York Executive Law § 296, on the grounds that Plaintiff failed to file a Notice of Claim as required by state law. (Defs.Memo at 52–53; *see* N.Y.Gen. Mun.Law § 50–e; N.Y.Unconsol.Laws § 7401(2).)

■ State claims brought under state law in federal court are subject to state proce-

dural rules. *See Felder v. Casey,* 487 U.S. 131, 141, 108 S.Ct. 2302, 2313–14, 101 L.Ed.2d 123 (1988). Under New York Unconsolidated Law § 7401(2), a plaintiff must serve a notice of claim against the HHC for "injuries to real or personal property, or for the destruction thereof, or for personal injuries or death...." This provision incorporates the notice of claim requirements set forth in New York General Municipal Law § 50–e. *See* N.Y.Unconsol.Laws § 7401(2) ("[a]ll the provisions of section fifty-e of the general municipal law shall apply to such notice.")

■ New York courts have limited the application of General Municipal Law § 50–e to tort actions. *See Lenihan v. City of New York,* 636 F.Supp. 998, 1017 (S.D.N.Y.1985). Since both federal and New York State courts do not regard an action brought under Executive Law § 296 to be a tort action, such claims are not subject to the notice of claim requirements of General Municipal Law § 50–e. *Peart v. City of New York,* No. 87 Civ. 4932 (CSH), 1991 WL 206315, *4 (S.D.N.Y. Sept. 27, 1991) ("§ 296 is not subject to the notice of claim provisions contained in General Municipal Law § 50–e ... [P]laintiff's § 296 claim will not be barred by her failure to file a notice of claim pursuant to Municipal General Law § 50–e.") (citing *Mills v. County of Monroe,* 89 A.D.2d 776, 453 N.Y.S.2d 486, 487 (4th Dept.), *aff'd,* 59 N.Y.2d 307, 464 N.Y.S.2d 709, 451 N.E.2d 456 (1982), *cert. denied,* 464 U.S. 1018, 104 S.Ct. 551, 78 L.Ed.2d 725 (1983)). *See also Davis v. New York City Dept. of Mental Health,* No. 88 Civ. 8999 (DC), 1994 WL 669494, *1 (S.D.N.Y. Nov. 29, 1994) (notice provisions in General Municipal Law § 50–i inapplicable to plaintiff's state Human Rights Law claim, since § 50–i applies to tort actions, not employment discrimination suits, against New York City); *Majors v. New York City Dept. of Sanitation,* No. 91 Civ. 8742 (TPG), 1993 WL 336949, *2 (S.D.N.Y. Sept. 3, 1993) (General Municipal Law

---

**4.** It follows that Defendants' arguments that Plaintiff should have amended her EEOC charge, after she retained counsel, to allege retaliation by the Personnel Department, and that she did not comply with the 300–day statute of limitations

with respect to that claim, are without merit. *See, e.g., Owens,* 934 F.2d at 410 (no EEOC amendment is necessary where a retaliation claim is deemed to be reasonably related to the initial charge).

§ 50–e inapplicable to state discrimination claim brought under Executive Law § 296); *accord Hilow v. Rome City School Dist.,* No. 91 Civ. 567, 1994 WL 328625, *8 ("claims under § 296 do not constitute torts subject to the notice of claim provisions of Education Law § 3813(2) and General Municipal Law §§ 50–e and 50–i incorporated therein."). Since there is no requirement that Plaintiff file a notice of claim for her claims brought under Executive Law § 296, her failure to do so does not deprive the Court of jurisdiction.

## II. *Mt. Sinai's Status as a Party Defendant*

Defendants contend that Plaintiff's claims against Mt. Sinai should be dismissed because: (1) Plaintiff failed to name Sinai in her original EEOC charge and the Notice of Right to Sue does not mention Sinai (Defendant's Memorandum of Law, dated January 14, 1994 ["Defs.Memo"], at 15–19; Defendants Reply, dated February 18, 1994 ["Defs.Reply"], at 1–7; Defs.Ex. DD); and, (2) Sinai is not Plaintiff's employer within the meaning of Title VII or the New York State Human Rights Law such that it may be held liable for Plaintiff's discrimination claims. (Defs.Memo at 20–24; Reply at 8–9.) Plaintiff counters that: (1) there is a sufficient identity of interest between Sinai and the parties named in the EEOC Complaint to vest the Court with jurisdiction (Plaintiff's Memorandum of Law, dated February 11, 1994, ["Pl.Memo"], at 13–24); and (2) Sinai may be viewed as Plaintiff's employer since it controlled the means and manner by which Plaintiff's work was accomplished, or alternatively, because Sinai and HHC are an integrated enterprise. (Pl.Memo at 54–61).

### A. *Failure to Name Mt. Sinai in the EEOC Charge*

Title VII provides that "a civil action may be brought [in district court] against the respondent named in [the EEOC] charge ... by the person claiming to be aggrieved." 42 U.S.C. § 2000e–5(f). "The purpose of this requirement is to notify the charged party of the alleged violation and to bring him before the EEOC, thereby permitting 'effectuation of the Act's primary goal,

the securing of voluntary compliance with the law.'" *Dirschel v. Speck,* No. 94 Civ. 0502 (LMM), 1994 WL 330262, *3 (S.D.N.Y. July 8, 1994) (quoting *Giuntoli v. Garvin Guybutler Corp.,* 726 F.Supp. 494, 498 (S.D.N.Y. 1989) (quoting *Koster v. Chase Manhattan Bank,* 554 F.Supp. 285, 289 (S.D.N.Y.1983))). A prerequisite to maintaining a Title VII action against a defendant, therefore, is the filing of a charge with the EEOC or authorized state agency, naming the defendant. *See Johnson v. Palma,* 931 F.2d 203, 209 (2d Cir.1991); *Bridges v. Eastman Kodak Co.,* 822 F.Supp. 1020, 1023 (S.D.N.Y.1993); *Gilmore v. Local 295,* 798 F.Supp. 1030, 1037 (S.D.N.Y.1992), *aff'd,* 23 F.3d 396 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 335, 130 L.Ed.2d 293 (1994).

Although a plaintiff is required to name the defendant in the administrative charge, courts have interpreted Title VII's procedural requirements flexibly and created several exceptions to this rule. *See Johnson,* 931 F.2d at 209; *Bridges,* 822 F.Supp. at 1025 n. 6. One such exception allows a Title VII action to be maintained against a party not named in the EEOC charge where that party has an "identity of interest" with a defendant named in the charge. *See Johnson,* 931 F.2d at 209. "Courts have allowed this 'identity of interest' exception because it is important to maintain 'the availability of complete redress of legitimate grievances without undue encumbrance by procedural requirements ...'" *Goyette v. DCA Advertising, Inc.,* 830 F.Supp. 737, 747 (S.D.N.Y. 1993) (quoting *Glus v. G.C. Murphy Co.,* 562 F.2d 880, 888 (3d Cir.1977) ("*Glus I* ")).

In determining whether the identity of interest exception applies, the court must consider the following factors: (1) whether the role of the unnamed party could have been ascertained by the plaintiff at the time she filed her EEOC complaint; (2) whether, under the circumstances, the interests of a named party are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; (3) whether its absence from the EEOC proceedings result-

ed in actual prejudice to the interests of the unnamed party; and, (4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Johnson,* 931 F.2d at 209–10 (citing *Glus I,* 562 F.2d at 888). This four-prong test is not a mechanical one; no single factor is determinative. *Goyette,* 830 F.Supp. at 748. Instead, courts are to evaluate each factor in light of the statutory purposes underlying Title VII. *Glus v. G.C. Murphy Co.,* 629 F.2d 248, 251 (3d Cir.), *cert. denied,* 449 U.S. 949, 101 S.Ct. 351, 66 L.Ed.2d 212 (1980) ("*Glus II*").

In this case, the second and third prongs of the *Johnson/Glus* test, most significant because they serve the underlying purpose of Title VII, weigh strongly in Plaintiff's favor, so as to confer jurisdiction over Sinai. The first and fourth prongs tilt less clearly either in favor or against jurisdiction.

With respect to the first prong of the identity of interest test, Plaintiff knew that Sinai was Levengood's employer, and thus could have named Sinai in her EEOC charge. However, she was proceeding *pro se* at the time she initially filed the EEOC charge and was counseled by the EEOC investigator not to change her administrative charge to name Sinai. (Dortz Aff. ¶¶ 44–46.) *See, e.g., Goyette,* 830 F.Supp. at 748 (identity of interests found where plaintiffs knew the identity of the unnamed defendant but had been dissuaded from naming the unnamed party in EEOC complaint).

With respect to the second element, the record establishes that Sinai and the named Defendants possess a commonality of interests. Sinai and HHC employees share responsibility for providing services at Elmhurst, pursuant to an affiliation agreement between the two entities (Exhibit C, annexed to Goodman Affidavit, dated February 9, 1994, ["Pl.Ex. C"] ), and HHC and Sinai employees jointly participate in at least certain aspects of policy-making at the hospital (*see* Deposition of Lawrence Cuzzi, dated July 20, 1993 ["Cuzzi Depo. I"], at 19–20, 25). Similarly, as discussed in detail in the following section, Sinai and HHC personnel are intertwined in the functioning of the ATP. (Pl. Ex. C.) Indeed, Sinai employees—Levengood, Cuzzi and Sullivan—were directly involved in the events giving rise to this action. In addition, Sinai employees were also required to implement measures to comply with the mandates of Title VII, since Sinai was bound by HHC's policies on discrimination, and Elmhurst had the right to secure compliance by Sinai with EEOC laws. (Defs.Ex. E, § 5.)

With respect to the third identity of interest factor, Sinai was not prejudiced by Plaintiff's failure to name it in her EEOC charge, despite Defendants' conclusory allegation to the contrary. Sinai had ample notice that it might be subject to suit. Sinai counsel and other representatives attended a fact-finding conference and conciliation proceeding on Plaintiff's administrative charges (Defs.Ex. AA), and opposed Plaintiff's request to amend her administrative charge. (Defs.Ex. BB.) If Sinai did not have adequate notice that it might be a defendant in this action based upon the above facts, it clearly was on notice after the State Division granted Plaintiff's amendment to her state claim, to include Sinai as a respondent.[5] *See, e.g., Alcena v. Raine,* 692 F.Supp. 261, 269 (S.D.N.Y. 1988) (unnamed defendant on notice where State Division complaint had been amended to add that party, even though the EEOC charge was not).

Sinai's claim of prejudice resulting from its failure to conduct an investigation into Plaintiff's allegations (Defs.Memo at 18–19), is belied by the fact that Sinai employees, Sullivan and Cuzzi, were the individuals who ini-

---

5. In a related argument, Plaintiff contends that her EEOC charge was effectively amended to include Sinai as a respondent when her State Division charge was amended. (Pl.Memo at 12–13.) The Work–Sharing Agreement between the EEOC and State Division strongly suggests that the State Division could accept Plaintiff's amendment on behalf of the EEOC. (Pl.Ex. A.) The fact that the State Division amendment also stated the Federal charge number suggests that the EEOC was aware of the amendment. (Defs.Ex. CC.) However, the record is not sufficiently developed to allow a conclusion that, based solely on the State Division amendment, the EEOC charge was also amended to name Sinai as a Respondent.

tially responded to Plaintiff's complaints. Indeed, it is somewhat disingenuous for Defendants to argue that they had no interest in the EEO proceedings because they were not a party, in light of the fact that, under its Affiliation Agreement with HHC, Sinai could have faced potentially negative consequences as a result of having its employee accused of sexual harassment. (*See* Defs.Ex. E.)

The fourth prong of the identity of interest exception addresses a situation where a principal-agent relationship exists and only one of them is named in the administrative complaint. *Johnson*, 931 F.2d at 210. *See also Bridges*, 822 F.Supp. at 1025 (fourth element of test satisfied, where an agency relationship existed between named and unnamed defendants). Construing the record in a light most favorable to Plaintiff, the nonmoving party, there is ample support for the proposition that, pursuant to the Affiliation Agreement, Sinai acts as an agent of HHC with respect to numerous aspects of care at Elmhurst, including the ATP. Nonetheless, the literal language of the fourth prong seems to suggest that the unnamed party be the principal who suggests to a plaintiff that its relationship with the plaintiff is to be conducted through its agent. This case presents the reverse situation, where the unnamed party—Sinai—operates as the named party's agent. This distinction, however, does not appear to be determinative. There is a closeness of relationship between Sinai and HHC, which is the primary concern of this prong. *See, e.g., Bridges*, 822 F.Supp. at 1025 ("the court's real concern in *Johnson* with respect to the fourth factor seemed to be the closeness of the relationship between the named and unnamed defendants." [citation omitted]).

In sum, I find that an exception is justified to allow Plaintiff to maintain her claims against Sinai. *See, e.g., Dirschel*, 1994 WL 330262 at **3–4 (plaintiff could maintain Title VII action against doctor not named in EEOC charge, since a substantial identity of interest existed between the doctor and hospital-employer that had been named in the charge, doctor was considered an agent of hospital in terminating plaintiff and knew of EEOC charge; and doctor had been invited

to conciliation proceedings); *Alcena v. Raine*, 692 F.Supp. 261, 269 (S.D.N.Y.1988) (plaintiff, a physician, could maintain suit against defendant medical center that was not named in original administrative charge but had been added as a respondent in amended State Division claim, even though plaintiff's formal employer was a separate entity—a hospital that was related to the medical center by an affiliation agreement—since there was no prejudice or lack of notice to the unnamed defendant, who had participated in fact-finding conference, investigation and conciliation proceedings) Therefore, I recommend that Sinai's motion to dismiss Plaintiff's claims against Sinai for lack of subject matter jurisdiction be denied.

### B. *Sinai's Status as Plaintiff's Employer*

■■■■ Sinai argues that it should be dismissed as a defendant because it was not Plaintiff's employer. I disagree. Title VII and the New York State Human Rights Law prohibit discriminatory practices of "employers". 42 U.S.C. § 2000e–2(a); N.Y.Exec. Law § 296(1)(a). Title VII defines an 'employer' as "a person engaged in any industry affecting commerce . . . and any agent of such person." 42 U.S.C. § 2000e(b). The definition of an "employer" is construed liberally. *See, e.g., EEOC v. Sage Realty Corp.*, 507 F.Supp. 599, 611 (S.D.N.Y.1981) ('employer' includes persons "who are not employers in conventional terms, but who nevertheless control some aspect of an employee's compensation or terms, conditions or privileges of employment."). The construction of the term "is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an 'employer' of an aggrieved individual as that term has generally been defined at common law." *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir.1982), *vacated and remanded on other grounds*, 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983).

■■■ "In keeping with [this] liberal construction, the courts of this Circuit have held

that the absence of a direct employment relationship does not bar a Title VII claim, and that liability extends beyond conventional single-employer situations." *Alie v. NYNEX Corp.*, 158 F.R.D. 239, 245 (E.D.N.Y.1994) (citations omitted). *See also Matthews v. New York Life Ins. Co.*, 780 F.Supp. 1019, 1023 (S.D.N.Y.1992) (" 'To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.' " (quoting *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338, 1341 (D.C.Cir.1973)); *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 611 F.Supp. 344, 347 (S.D.N.Y.1984) ("[i]t is significant that in providing a private right of action against a statutory employer Title VII does not refer to 'employee' but to 'the person aggrieved,' a term that has been construed 'as comprehending individuals who do not stand in a direct employment relationship with an employer.' " (quoting *Sibley*, 488 F.2d at 1341)). Accordingly, when several entities "have an integrated economic relationship and exercise common control over employment practices" that affect an employee, each may be held liable for the other's discriminatory acts and policies as an integrated enterprise. *Streeter v. Joint Indus. Board of Elec. Indus.*, 767 F.Supp. 520, 527 (S.D.N.Y.1991). *See also Perry*, 675 F.Supp. at 1425–26 (one of the defendant's held to be interrelated with direct employer so that the court could assume joint responsibility for one defendant's acts where they shared same offices, had common management and, in reality, employees of one entity worked for the other); *Sage Realty*, 507 F.Supp. at 611 (although plaintiff was employed by dry cleaning store, court held that the building management company for the building in which store was located could be held liable as joint employer for Title VII purposes because it exercised control over the terms and conditions of Plaintiff's employment).

■ In addition, even where there is not an integrated enterprise or joint employer relationship, entities may be "simultaneous" employers where they control the economic realities of the employment relationship with the employee and the means and manner of the worker's performance. *See, e.g., Amarnare*, 611 F.Supp. at 347–48; *Goyette v. DCA Advertising, Inc.*, 830 F.Supp. 737, 744 (S.D.N.Y.1993).

■ Regardless of the basis upon which an entity is deemed to be an "employer" within the meaning of Title VII, the most important factor to consider is "the degree of control [the entity] exercises over policymaking and the means and manner of an employee's work performance." *Alie*, 158 F.R.D. at 246; *see also Amarnare*, 611 F.Supp. at 348 ("[w]hen an employer has the right to control the means and manner of an individual's performance ... an employer-employee relationship is likely to exist. Factors other than control are then of marginal importance." (footnote omitted)).

In the instant action, the record establishes that Sinai controlled the means and manner of Plaintiff's employment, although Plaintiff was formally employed by HHC. All of Plaintiff's direct superiors who determined the conditions of her employment at the ATP were Sinai employees. Dr. Cuzzi prepared Plaintiff's annual performance evaluation on a form issued by HHC, and signed the form as "department head." (Dortz Aff. Ex. B.) As such, Cuzzi had power to affect Plaintiff's opportunities for promotion. Indeed, Plaintiff attributes her promotion to the position of Assistant Director of ATP to a favorable evaluation she received from Cuzzi and Enoch Gordis, another Sinai employee. (Dortz Aff. ¶ 3.) Moreover, Cuzzi testified at his deposition that he did not believe there were any limitations on his power to supervise Plaintiff. (Cuzzi Depo. II at 166.)

■ Dr. Sullivan, the Director of Psychiatry at Elmhurst who supervised the ATP, was also a Sinai employee. Levengood, who was responsible for the clinical, medical, and psychiatric components of the ATP and reported to Sullivan, was a Sinai employee as well. Plaintiff was required to seek Sullivan and/or Levengood's approval on all matters related to policy. (Sullivan Depo. at 48–49;

Defs.Exs. F and G.) Since Sinai controlled significant aspects of the conditions, means and manner of Plaintiff's employment, Sinai may be viewed as Plaintiff's employer within the meaning of Title VII. At a minimum, Plaintiff has tendered sufficient evidence to establish a factual dispute with respect to this issue.[6]

In addition, there is evidence in the record to conclude that Sinai and HHC constituted an integrated enterprise, or were simultaneous employers, such that Sinai may be deemed to be Plaintiff's employer. As Defendants have conceded, Sinai jointly exercised control over certain operations of Elmhurst Hospital, with the approval of Elmhurst's Executive Director, Pedro Velez, who is employed by HHC. (Defs.Memo at 22.) Velez held weekly executive staff meetings attended by both HHC and Sinai employees (Deposition of Gloria Sierra, dated July 9, 1993 ["Sierra Depo"], at 56–57); certain HHC and Sinai employees also attended a monthly Medical Board meeting (Sullivan Depo. at 20–21); Sullivan attended a monthly meeting of all HHC directors of psychiatry (Sullivan Depo. at 16.); Sullivan was interviewed for her position by both Sinai and HHC personnel (Sullivan Depo. at 8–10); and, Velez was responsible for all staff at

Elmhurst, including those employed by Sinai, with respect to complying with and implementing EEO policy (Velez Depo. at 18–19). Indeed, the Elmhurst organizational chart, itself, reveals a functional interrelationship between Sinai and HHC, in that reporting relationships flowed from HHC personnel to Sinai staff and then, once again, to HHC employees. (Pl.Exs. B and C.)

The organizational structure of the ATP also reflects this interrelationship, since HHC employees were supervised by Sinai employees who, in turn, reported to HHC employees. (Pl.Ex. B; Deposition of Lawrence Cuzzi, dated July 20, 1993 ["Cuzzi Depo. I"] at 27–29; Sullivan Depo. at 18–20.)

Further, the record clearly establishes that HHC delegated to Sinai substantial authority with respect to the ATP. Sullivan was responsible for establishing ATP programs and policy. (Defs.Ex. F.) Indeed, after Plaintiff's employment terminated, Cuzzi was responsible for selecting her replacement and Sullivan interviewed the candidate. (Cuzzi Depo. I at 36–37.) The structure and the functional interrelationship between HHC and Sinai reveal, therefore, that HHC and Sinai were sufficiently interrelated so as to deem Sinai at least one of Plaintiff's employers within the meaning of Title VII.[7]

6. Plaintiff also has argued that Defendants conceded the question of Sinai's status as Plaintiff's employer when they admitted this allegation in their Answer. *See* Verified Answer ¶¶ 6–7. Defendants claim that the admission was inadvertent, and that they will seek leave to amend if they are denied summary judgment. *See* Reply at 8, n. 2. In general, a formal judicial admission in a pleading is conclusive against the party making the admission. *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121–22 (2d Cir. 1990) (admission in answer found to be conclusive against the party who made it in the context of a summary judgment motion); *Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Maryland*, 763 F.Supp. 28, 32–33 (S.D.N.Y.1991) (admission in defendant's Answer binding for purposes of a motion to dismiss). However, the Second Circuit has indicated that, where a party claims that its admission is the result of fraud or mistake, the admission may not necessarily be binding. *See, e.g., Western World Ins.*, 922 F.2d at 122 (court noted that the party making the admission did not claim fraud or mistake). Since Defendants assert that their admission was inadvertent and that they intend to seek leave to amend their Answer, without passing on the merits of any

such proposed amendment, I do not rely on their Answer to resolve this question.

7. Defendants, in their summary judgment submission, suggest that the above standards for determining whether an entity is an employer under Title VII may have been called into doubt by the Second Circuit's decision in *Frankel v. Bally, Inc.*, 987 F.2d 86 (2d Cir.1993). In *Frankel*, an ADEA plaintiff had performed work for the defendant through a corporate entity that the plaintiff had established. The Second Circuit was required to address the issue of whether the plaintiff was an employee of the defendant or an independent contractor. The court remanded the case to the district court, based upon the Supreme Court's decision in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), to consider the question by reference to common law agency principles. *Id.* at 90–91.

Defendants in this action concede that the context of the *Frankel* decision is different from the case at bar. *See* Def. Memo at 21. That difference renders *Frankel* inapposite. Defendants have not claimed that Plaintiff worked for Sinai as an independent contractor, nor have Defen-

Defendants' reliance on the fact that HHC and Sinai are distinct entities whose powers are circumscribed by the Affiliation Agreement, and that Sinai cannot control certain aspects of Plaintiff's employment such as salary and benefits, does not undermine this conclusion, since the term "employer" under Title VII is construed by reference to the realities rather than the formalities of an employment relationship. *See, e.g., Spirt,* 691 F.2d at 1062–63 (although plaintiff, a college professor, clearly was not an employee of defendants who administered retirement annuity plans for university, defendants were delegated responsibility by plaintiff's employer and were therefore "so closely intertwined" with employer to be deemed an employer for Title VII purposes).

In sum, the record strongly supports the conclusion that Sinai was Plaintiff's employer within the meaning of Title VII. Consequently, Defendant Sinai is not entitled to judgment as a matter of law on this issue.[8]

### III. *Plaintiff's Discrimination Claims*

#### A. *Summary Judgment Standard*

Under Rule 56(c), Fed.R.Civ.P., a motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995). The movant must satisfy a burden of showing the absence of a genuine issue as to any material fact. *Celotex,* 477 U.S. at 323–25, 106 S.Ct. at 2553–54; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *LaFond v. General Physics Services Corp.,* 50 F.3d 165, 171 (2d Cir.1995); *Cronin,* 46 F.3d at 202; *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1223 (2d Cir.1994).

In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *LaFond,* 50 F.3d at 171; *Cronin,* 46 F.3d at 202; *Gallo,* 22 F.3d at 1223; *Donahue v. Windsor Locks Board of Fire Commissioners,* 834 F.2d 54, 57 (2d Cir.1987). "The inferences to be drawn from the underlying facts revealed in materials such as affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *see also Cronin,* 46 F.3d at 202; *LaFond,* 50 F.3d at 171.

On a motion for summary judgment, a court " 'cannot try issues of fact; it can only

---

dants suggested that Plaintiff would *not* be considered Sinai's agent under common law agency principles. In any event, since the court in *Frankel* acknowledged that the agency analysis "places [its] greatest emphasis on the hiring party's right to control the manner and means by which the work is accomplished" (*Id.* at 90) and the evidence establishes that Sinai did exercise such control over Plaintiff, my conclusion would remain the same even if I were to apply the common law agency analysis in *Frankel* to this action.

**8.** The record also precludes granting Sinai summary judgment on the question of its status as an employer under the New York State Human Rights Law. To determine whether an entity is an employer for purposes of maintaining a state discrimination claim, the court considers the following factors: (1) whether the entity was responsible for the selection and engagement of the employee; (2) whether the entity paid the employee's wages; (3) whether the entity had the power to dismiss the employee; and (4) whether the entity had the power to control the employee's conduct. *Goyette,* 830 F.Supp. at 746 (citing *State Div. of Human Rights v. G.T.E. Corp.,* 109 A.D.2d 1082, 1083, 487 N.Y.S.2d 234, 235 (4th Dept.1985)). The most important element in this analysis is the entity's degree of control over the employee's conduct. *Alie,* 158 F.R.D. at 246 (citing *In re Villa Maria Institute of Music v. Ross,* 54 N.Y.2d 691, 692, 442 N.Y.S.2d 972, 973, 426 N.E.2d 466, 467 (1981)); *Germakian v. Kenny Int'l Corp.,* 151 A.D.2d 342, 343, 543 N.Y.S.2d 66, 67 (1st Dept.1989), *appeal denied,* 74 N.Y.2d 615, 549 N.Y.S.2d 960, 549 N.E.2d 151.

As discussed above, although Sinai did not have ultimate authority to engage or dismiss Plaintiff and did not pay Plaintiff's wages, there is ample evidence in the record indicating that Sinai employees exercised significant influence and control over Plaintiff's conditions of employment and fate at Elmhurst.

determine whether there are issues to be tried.'" *Donahue,* 834 F.2d at 58 (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975)); *see also LaFond,* 50 F.3d at 171; *Cronin,* 46 F.3d at 203; *Gallo,* 22 F.3d at 1224 ("[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.") "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Cronin,* 46 F.3d at 203; *see also LaFond,* 50 F.3d at 171.

■■■■ In Title VII cases alleging adverse action, a plaintiff must initially establish a *prima facie* case of discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *see also St. Mary's Honor Center v. Hicks,* —— U.S. ——, —— – ——, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993). "[T]he showing the plaintiff must make as to the elements of the *prima facie* case in order to defeat a motion for summary judgment is *'de minimis'*." *Cronin,* 46 F.3d at 203–04; *see also Chambers,* 43 F.3d at 37; *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir. 1988). "In determining whether the plaintiff has met the *de minimis* initial burden of showing 'circumstances giving rise to an inference of discrimination,' the function of the court on a summary judgment motion is to determine whether the 'proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.'" *Cronin,* 46 F.3d at 204 (quoting *Chambers,* 43 F.3d at 38). Where a Title VII defendant's intent is at issue, summary judgment is generally inappropriate. *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991).

## B. *Sexual Harassment Claim*

■■■■ A Title VII plaintiff seeking relief for sexual harassment may proceed under one of two theories: (1) quid pro quo; or, (2) a hostile work environment. *Meritor Savs. Bank v. Vinson,* 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986); *Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d Cir.1994), *cert. denied,* —— U.S. ——, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59, 62 (1992). In this action, Plaintiff has asserted that Dr. Levengood's sexual harassment created a hostile work environment.

■■■■ To establish a claim for sexual harassment based upon a hostile work environment theory, a plaintiff must demonstrate not only actionable sex discrimination, but also that the wrongdoer's actions should be imputed to the employer. *Kotcher,* 957 F.2d at 63. To establish actionable sexual harassment, a plaintiff is required to demonstrate: "(1) that she is a member of a protected group; (2) that she was the subject of unwelcome advances; (3) that the harassment was based upon her sex; and (4) that the harassment affected a term, condition or privilege of employment." *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1042 (2d Cir.1993). *See also Trotta v. Mobil Oil Corp.,* 788 F.Supp. 1336, 1348 (S.D.N.Y.1992). To impute liability to an employer, the plaintiff must demonstrate that the employer failed to provide a reasonable avenue for complaint or knew about the harassment but did not take effective remedial action. *Kotcher,* 957 F.2d at 63; *Donato v. Rockefeller Financial Servs.,* No. 93 Civ. 4663 (LLS), 1994 WL 495791, *2 (S.D.N.Y. Sept. 8, 1994). Under certain circumstances, an employer can be held *per se* liable, "for the discriminatorily abusive work environment created by a supervisor if the supervisor uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship." *Karibian,* 14 F.3d at 780.

### 1. *Actionable Sexual Harassment*

■■■■ A hostile work environment sufficient to find actionable sex discrimination

exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of a victim's employment....'" *Harris v. Forklift Sys.*, —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor*, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 2404, 2405, 91 L.Ed.2d 49 (1986)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, —— U.S. at ——, 114 S.Ct. at 370.

■ The determination of what constitutes a hostile work environment "is not, and by its nature cannot be, a mathematically precise test." *Id.* at ——, 114 S.Ct. at 371. Rather, it rests upon an examination of the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive." *Id.; see also Kotcher*, 957 F.2d at 62. All factors may be considered, and no single factor is determinative. *Harris*, —— U.S. at ——, 114 S.Ct. at 371.

■ Although "[c]asual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute....", *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986), a "female employee need not subject herself to an extended period of demeaning and degrading provocation before being entitled to seek the remedies provided under Title VII...." *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 578 (2d Cir.1989).

■ In the present action, Plaintiff has alleged a pattern of sexual harassment by Levengood, including at least eleven offensive comments in the course of approximately one month. Among the comments allegedly made by Dr. Levengood were: 1) "Cynthia Dortz is queer, asexual, needs a good fuck-ing, but I wouldn't do it with someone else's dick. She's probably a lesbian"; 2) at least two statements to ATP staff members concerning his "fantasy of Cynthia in black leather," stating that he "would like to pull Cynthia's hair out of her head. I could shit on her neck."; 3) "[I] could see Cynthia on weekends, dressed in black leather, wearing a mask". In addition, Plaintiff alleges that he referred to her as a "the frustrated bitch," stating in one instance that she was "the frustrated bitch social work supervisor, who had better shape up or else." Further, Levengood warned Plaintiff, "this could develop into a sado-masochistic relationship, but I'm not going to let that happen."

■ Defendants contend that some of Levengood's remarks were not directed at Plaintiff because of her gender or they were not sexual in nature. (Defs.Memo at 26–30.) With respect to certain comments, I do not disagree. For example, Levengood's comment about a patient masturbating was not directed at Plaintiff because of her gender, and appears to reflect his general crassness rather than sexual harassment. In addition, Levengood's voodoo doll comment was not sexual in nature or made in a "sexual context."

Nevertheless, other comments were clearly sexual or gender-related, or they give rise to a question of fact that should not be resolved on a motion for summary judgment. For example, a factfinder could conclude that, because there is no evidence that Levengood referred to male workers as "bitch," "passive-aggressive," or suggested that they acted as "children" or "need[ed] a good fucking", or that he conveyed images of men in humiliating sado-masochistic roles, that these comments were directed at Plaintiff because she was a woman. *See, e.g., Equal Employment Opportunity Comm'n v. A. Sam & Sons Produce Co.*, 872 F.Supp. 29, 35–36 (W.D.N.Y.1994) ("the term, 'whore' is usually gender-specific and is certainly more offensive when directed at a woman. Thus the inference is sufficiently strong that [the harassing employee's] conduct was directed at [the plaintiff] because she was a woman."); *cf. Fair v. Guiding Eyes for the Blind, Inc.*, 742 F.Supp. 151, 156 (S.D.N.Y.1990) (calling

a man on a golf course "bitch" is not considered sexual harassment).

■ Moreover, "the conduct underlying a sexual harassment claim need not be sexual in nature as long as the conduct is directed at the employee because of his or her sex. Adopting such a standard recognizes that 'intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances.'" *Trotta,* 788 F.Supp. at 1349 (quoting *Hall v. Gus Constr. Co., Inc.,* 842 F.2d 1010, 1014 (8th Cir.1988)). I would note that Elmhurst's EEO Officer, Gloria Sierra, testified at her deposition that, in her opinion, Levengood's comment that quality assurance is like venereal warts (which was made at a meeting attended by both men and women), and his comment to Plaintiff that she was passive-aggressive, could be viewed as sexually harassing statements. (Sierra Depo. at 237–39.)

■ Further, offensive statements made to other ATP staff, including Plaintiff's supervisees, outside of Plaintiff's presence, may also be viewed by a factfinder as having contributed to creating a hostile work environment. *See, e.g., Barbetta v. Chemlawn Services Corp.,* 669 F.Supp. 569, 572 (W.D.N.Y.1987) ("While some of these incidents were not directed specifically at [the plaintiff], and others were not witnessed by her, they are all evidence of a hostile and sexually offensive working environment...."). Indeed, a factfinder could conclude that those remarks made about Plaintiff to her subordinates were humiliating and degrading precisely because they were made to Plaintiff's staff; further, it would not be unreasonable for a factfinder to conclude that, by making such comments to Plaintiff's subordinates, Levengood interfered with and undermined Plaintiff's ability to function in a

supervisory capacity. Indeed, several of Plaintiff's supervisees indicated, in written memoranda, that they believed that Levengood's conduct hindered the functioning of the ATP and Plaintiff's ability to perform her job. (*See* Defs.Exs. J–O.) [9]

Defendants further contend that Levengood's statements were "no more than sporadic offhand remarks" that cannot be viewed as having created a hostile work environment. (*See* Defs.Memo at 28.) Although some of the remarks may have been casual, in considering the evidence in a light most favorable to Plaintiff, which I am bound to do, I find that a factfinder could reasonably conclude that Levengood's comments were, in their totality, more than simply offhand remarks. Indeed, one could reasonably find that, as a whole, Levengood's conduct was persistent and calculated, sexually degrading, and laced with violent and perverse sexual references. Cuzzi testified at his deposition that he and the two EEOC officers at Elmhurst hospital, Alvarez and Sierra, felt that the comments attributed to Levengood were sexually offensive. (Cuzzi Depo. II at 196–97.) In addition, Velez stated at his deposition that he felt that certain statements were "sexually offensive" and some even "[went] beyond sexual offensiveness." (Velez Depo. at 60–64.)

The fact that Levengood and Plaintiff were required to work closely together within a relatively discrete program may be reasonably viewed by a factfinder as intensifying the severity of Levengood's conduct. As Elmhurst's Executive Director, Pedro Velez, testified at his deposition, cooperation between Levengood and Plaintiff was essential for the ATP to function properly. (Velez Depo. at 55.)

■ While Levengood's conduct may have taken place over a relatively brief peri-

---

9. For example, Grabarnick wrote that the comments created an "uncomfortable working environment and effects [sic] morale and should not be tolerated." (Defs.Ex. K.) Al Brockway wrote that he was "offended and highly disillusion[ed] about the qualifications of Dr. Levengood" and that his "unprofessional behavior ... had the effect of demoralizing myself of hopes for a successful program.... [It] can only serve to undermine any efforts of staff to provide good qual-

ity patient care and service and is a deliberate attempt to undermine social work staff confidence in Ms. Dortz in an effort to drive her out of her position." (Defs.Ex. N.) Joyce Richardson stated that Levengood "fails to appreciate the significance for staff morale, program functioning and patient care of his prejudicial, disrespectful and hostile comments about our supervisor and Assistant Director of our department." (Defs.Ex. O.)

od of time—one month—"[it] is not how long the sexual innuendos, slurs, verbal assaults, or obnoxious course of conduct lasts." *Carrero*, 890 F.2d at 578. Rather, "in analyzing 'the totality of the circumstances,' the pervasiveness of such actions is also to be determined by reference to '[t]he offensiveness of the individual actions complained of.'" *Zveiter v. Brazilian Nat'l Superintendency of Merchant Marine*, 833 F.Supp. 1089, 1095 (S.D.N.Y.1993) (quoting *Carrero*, 890 F.2d at 578). *See also A. Sam & Sons Produce Co.*, 872 F.Supp. at 35; *Watts v. New York City Police Department*, 724 F.Supp. 99, 105 (S.D.N.Y.1989). The fact that Levengood's statements were made over approximately a one-month period, therefore, does not necessarily preclude a finding that an abusive work environment existed. *See, e.g., Carrero*, 890 F.2d at 578 (Second Circuit upheld trial court's determination that conduct over two-week period constituted sexual harassment sufficient to establish hostile working environment in violation of Title VII); *Kotcher*, 957 F.2d at 61–63 (Second Circuit upheld court's finding, after trial, that conduct by harasser over approximately a two-month period in connection with one plaintiff created a hostile work environment, sufficient to satisfy the first element of sexual harassment claim); *Watts*, 724 F.Supp. at 105 (where the plaintiff alleged two assaults and comments were made during a one-month period, motion to dismiss was denied because of the severity of the conduct). Indeed, it could be concluded that the cumulative effect of these statements was severe and that the comments represented more than offhand remarks precisely because they were concentrated within the span of one month.

The Court could further conclude that Levengood's harassment "poisoned the work environment," so as to create a hostile environment. Numerous members of Plaintiff's staff wrote statements that corroborated her account of Levengood's behavior and reflected the way in which his conduct harmed the effective functioning of the program. *See* Defs.Exs. K, M, N and O; *supra* note 9. In fact, Elmhurst's Executive Director, Pedro Velez, conceded at his deposition that he believed that some of Levengood's comments would create a hostile work environment. (Velez Depo. at 60–64.) [10]

██ Finally, there is sufficient evidence in the record suggesting that Plaintiff experienced psychological and physical problems as a result of Levengood's conduct, to further allow a finding that a hostile work environment existed. Letters and written testimony submitted by Plaintiff's psychiatrist to the Worker's Compensation Board indicate that she suffered from irritable bowel syndrome, depression, and chronic post traumatic stress disorder as a result of the alleged harassment. (Dortz Aff.Exs. C, D and F.) Plaintiff was awarded worker's compensation, after a contested hearing, for post traumatic stress disorder and irritable bowel syndrome (Dortz Aff.Ex. I), and the Workers Compensation Board ultimately determined that she suffered from a permanent partial disability. (Dortz Aff.Ex. J.) As a result of her ailments, Plaintiff was required to take an extended medical leave. (Dortz Aff.Ex. C.)

In sum, in viewing the evidence in a light most favorable to Plaintiff and drawing all reasonable inferences in her favor, I cannot say that Plaintiff's evidence of sexual harassment is insufficient as a matter of law. Although there is some question as to whether Plaintiff will be able to establish by a preponderance of the evidence that Levengood was more than coarse and vulgar, and that his comments rise to the level of actionable sexual harassment, that issue should be resolved at trial. A factfinder could reasonably conclude that at least some of Levengood's statements were sexually harassing, that they were directed at Plaintiff based on her gender, and that they created a hostile work environment that substantially interfered with Plaintiff's ability to perform her job. *See, e.g., A. Sam & Sons Produce Co.*, 872

---

**10.** I give little weight to Defendants' contention that a "reasonable person working in a hospital would not find that statements referring to personality disorders or a sexually transmitted disease would create a hostile work environment...." *See* Defs.Memo at 29. That certain terms, such as "passive-aggressive" or "venereal warts", are commonly used in a hospital environment for the purpose of treating patients, does not render them benign when directed toward colleagues in an abusive manner.

F.Supp. at 34–35 (summary judgment denied where the plaintiff was subjected to five instances of sexually offensive conduct within one month, the plaintiff felt demeaned by the offensive comments, and the employee possessed "presumptive authority" over the plaintiff); *Ott v. Perk Dev. Corp.*, 846 F.Supp. 266, 272–73 (W.D.N.Y.1994) (court found that plaintiff established *prima facie* case of sexual harassment, although she alleged only one incident of a "patently" sexual nature and claimed she was treated more harshly than male counterparts, stating that it had "grave doubts" that the evidence would persuade the jury that the conduct constituted sexual harassment but that "issues of fact and credibility pervade this conclusion so as to preclude the entry of summary judgment...."); *Zveiter*, 833 F.Supp. at 1095 (defendants' summary judgment motion denied where plaintiff's evidence of a hostile work environment consisted of five allegations, one of which concerned "sporadic jokes" that were not even sexual, and another of which involved "discomfort" by plaintiff at having employees look at her legs); *but see Brostrom v. Hercules Corp.*, No. 92 Civ. 1674 (LBS), 1994 WL 592680, *8 (S.D.N.Y. Oct. 27, 1994) (alleged harasser's misconduct not sufficiently severe or pervasive where his presence in plaintiff's work environment was limited because he was based in Paris and plaintiff was based in New York, and he only visited New York three or four times over the ten-month period that plaintiff worked at the company); *Polley v. Federal Reserve Bank of New York*, No. 92 Civ. 7114 (JFK), 1994 WL 465923, *6 (S.D.N.Y. Aug. 23, 1994) (single instance where supervisor told a sexually oriented joke does not rise to the level of "pervasiveness" necessary to maintain a sexual harassment claim); *Trotta*, 788 F.Supp. at 1349–50 (eleven isolated incidents over more than seven years, some of which clearly were not sexually harassing or were uncorroborated, insufficient to establish abusive work environment).[11]

## 2. *Employer Liability*

■ Defendants contend that, even if Levengood's comments created an abusive work environment, Elmhurst took prompt and appropriate remedial action when it was apprised of Plaintiff's complaint, since Cuzzi and Sullivan spoke to Levengood and the remarks ceased. (Defs.Memo at 34–39.) Plaintiff argues that Defendants are *per se* liable for Levengood's conduct, since he used his actual or apparent authority over Plaintiff to further the sexual harassment. (Pl.Memo at 34.) In any event, Plaintiff claims, even if *per se* liability did not attach to Defendants, liability can be imputed to Elmhurst because it failed to take prompt and appropriate action in response to Plaintiff's complaints; at a minimum, Plaintiff contends, there are contested facts and inferences to preclude granting summary judgment to Defendants. (Pl. Memo at 34–42.)

■ When a high-level supervisor, acting within the scope of his actual or apparent authority, furthers the creation of a hostile work environment through sexual harassment, or "if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship", liability is automatically imputed to the employer. *Karibian*, 14 F.3d at 779. In general, however, the employer is not strictly liable for the conduct of its employees in Title VII sexual harassment actions. Rather, "where a low-level supervisor does not rely on his supervisory authority to carry out the harassment ... the employer will not be liable unless 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" *Id.* at 780 (quoting

---

**11.** The authority cited by Defendants (*see* Defs. Memo at 31) does not support judgment as a matter of law on this issue. In particular, the cases upon which Defendants rely, in arguing that Levengood's conduct was not sufficiently severe or pervasive, were decided after the plaintiff's evidence was adduced at a full trial and some of the plaintiff's allegations and testimony had been discredited by the court. *See, e.g., Christoforou v. Ryder Truck Rental, Inc.*, 668

F.Supp. 294 (S.D.N.Y.1987); *Buddle v. Heublein, Inc.*, 613 F.Supp. 491 (S.D.N.Y.1985). Further, one of the cases relied upon by Defendants was vacated and remanded on appeal. *See Currie v. Kowalewski*, 810 F.Supp. 31 (N.D.N.Y.1993), *vacated*, 14 F.3d 590 (2d Cir.1993). On remand, the district court found that there was sexual harassment based upon a hostile work environment. *See Currie v. Kowalewski*, 842 F.Supp. 57 (N.D.N.Y.), *aff'd*, 40 F.3d 1236 (1994).

*Kotcher,* 957 F.2d at 63); *see also Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2d Cir.1987). If an employer takes prompt and effective action in response to a complaint of sexual harassment, therefore, it cannot be held liable under Title VII. *See, e.g., Trotta,* 788 F.Supp. at 1351; *Bennett v. New York City Dep't. of Corrections,* 705 F.Supp. 979, 988 (S.D.N.Y.1989). However, "an employer's remedy must be real and not a 'sham.'" *Trotta,* 788 F.Supp. at 1351. The mere existence of a policy to redress complaints of sexual harassment will not insulate an employer from liability if it is not properly implemented. *See, e.g., Snell,* 782 F.2d at 1104–05.

 In evaluating the employer's actions in response to complaints of sexual harassment, courts consider whether the employer "'exhaust[ed] the field of reasonable and feasible actions' to cleanse [the] working environment." *Watts,* 724 F.Supp. at 107 (quoting *Snell,* 782 F.2d at 1104); *see also Babcock v. Frank,* 783 F.Supp. 800, 809 (S.D.N.Y.1992). The employer "has an obligation to investigate whether acts conducive to the creation of an atmosphere of hostility did in fact occur and, if so, it must attempt to dispel workplace hostility by taking prompt remedial steps." *Watts,* 724 F.Supp. at 108.

In the present action, there is no dispute that HHC has an explicit policy prohibiting sexual harassment. (Defs.Ex. R.) [12] Nor is there any dispute that HHC's policy provided Plaintiff with a reasonable avenue for complaint and that she followed that policy by promptly complaining about Levengood's conduct to Cuzzi.

However, there is a genuine factual dispute as to whether Levengood exercised sufficient authority over Plaintiff to hold Defendants *per se* liable for Levengood's conduct, and if not, whether Defendants' remedial actions were prompt and effective. On the one hand, there is some evidence in the record

suggesting that Levengood used his authority over Plaintiff to further sexual harassment: Plaintiff claims that the ATP was run by Levengood and that she worked under his direction (Dortz Aff. ¶¶ 4–5); Levengood's approval was required on matters related to policy (Sullivan Depo. at 48–49, 70); Levengood made sexually harassing comments about Plaintiff directly to her as well as other ATP employees (Defs.Ex. P); Plaintiff needed to consult with Levengood on various matters and he failed to respond to her calls (Defs.Ex. Y); and, Levengood was able to circumvent Plaintiff by, among other actions, giving directions to her staff and by excluding her from senior level meetings (Dortz Aff. ¶¶ 25–28; Defs.Ex. Y).

In contrast, Defendants dispute that Levengood could exercise authority over Plaintiff. They point to deposition testimony by Sullivan, stating that she would have spoken to Cuzzi in connection with Dortz' performance because Cuzzi was Plaintiff's supervisor (Sullivan Depo. at 63–64); Cuzzi's deposition testimony that he supervised Plaintiff (Cuzzi Depo. II at 166); and, Horen's deposition testimony that Cuzzi could terminate Plaintiff without his approval (Horan Depo. at 23–24). In addition, the record is unclear as to whether Levengood was sufficiently high-ranking for purposes of imputing liability to Sinai. In light of these factual disputes, it is not possible to conclude, for purposes of summary judgment, whether Levengood was, in reality, a supervisor over Plaintiff sufficiently high-ranking in the hospital hierarchy so that any liability on his part may be automatically imputed to Defendants.

Even if the Court were to determine, as a matter of law, that Defendants could not be held *per se* liable for Levengood's conduct, whether Elmhurst did or did not take prompt and effective remedial action in response to Plaintiff's complaints is a question properly left for trial. At a minimum, Plain-

---

**12.** HHC policy sets forth specific procedures for filing complaints within individual hospitals, such as Elmhurst, and with HHC central administration. (Defs.Ex. S and T.) Moreover, each hospital has an EEO Officer responsible for, among other things, investigating complaints. (Defs.Ex. U.) Under the HHC policy, HHC is required to take appropriate action in response

to substantiated accounts of discrimination, including discipline and termination. (Defs.Ex. R.) In addition, Alvarez testified at her deposition that when an EEO Officer receives a complaint about sexual harassment, regardless of the source, the officer is required to investigate the allegation. (Alvarez Depo. at 29–30.)

**154**

tiff has established the existence of a factual dispute regarding Elmhurst's response to her complaints.

First, there is evidence in the record suggesting that Defendants failed to follow HHC policy requiring the EEO Officer to investigate all allegations of sexual harassment, regardless of who reports it. (Alvarez Depo. at 29.) Cuzzi testified at his deposition that he promptly reported Plaintiff's allegations to Alvarez, Horan, and Gary O'Gwyn, Elmhurst's Chief Operating Officer. (Cuzzi Depo. II at 183–185, 201, 291–292.) However, neither Alvarez nor any of the above individuals took immediate action.[13] Indeed, the complaint was not investigated until well after Plaintiff had filed a formal EEOC charge. (Cuzzi Depo. II at 197–99.) Upon a finding of HHC's failure to implement its own remedial policy, employer liability could be established. *See, e.g., Brostrom,* 1994 WL 592680 at *8 ("if defendant actually knew of Lamson's acts of harassment and did nothing to stop them, [defendant's] grievance procedure, however good, would not save it [from liability]"). Moreover, the fact that a formal investigation was not conducted until March of 1991, three months after the complaints, may itself be viewed as untimely. *See, e.g., Bennett,* 705 F.Supp. at 988 (summary judgment denied where plaintiff was required to wait four weeks before employer spoke to her about alleged instances of harassment, and there was no evidence that anyone other than one of several colleagues who harassed plaintiff was reprimanded for his conduct, although several instances of harassment were promptly addressed by employer).

Second, apart from Alvarez' failure to conduct a formal investigation, there is evidence in the record that Cuzzi and Sullivan did not adequately investigate Plaintiff's allegations in December. Although Cuzzi met with ATP staff members in connection with Plaintiff's allegations and spoke with Levengood about the general nature of Plaintiff's complaint, he conceded that he did not feel as though he could investigate the charge, since he was not Levengood's superior. Sullivan's investiga-

tion consisted of confronting Levengood with the allegations. Based upon Levengood's denial and prior work references, Sullivan chose to believe Levengood and did not investigate further. At her deposition, Sullivan explained, "I just, my impression was that I believed him." (Sullivan Depo. at 86–87.) Sullivan refused Plaintiff's request to meet with her, claiming that "everything was under control." (Cuzzi Depo. II at 234–35.) Nor did she speak with the ATP staff members who had orally corroborated Plaintiff's claim at their meeting with Cuzzi, in an attempt to determine what had occurred.

Moreover, Plaintiff has tendered sufficient evidence from which a factfinder could conclude that, in addition to an inadequate investigation, Defendants' remedial action did not effectively cleanse the hostile environment caused by the sexual harassment. For example, Sullivan's response of instructing Levengood to speak with Plaintiff only in the presence of others, which was designed to protect Levengood from further claims of harassment, may be viewed as having aggravated the situation. (Sullivan Depo. at 93.) Not only did Cuzzi testify that such an instruction "could lead to some operational problems" (Cuzzi Depo. II at 216), but, since Sullivan did not inform Cuzzi of her instructions and Cuzzi counselled Plaintiff to seek out Levengood, Plaintiff felt increasingly isolated and frustrated.

In addition, Sullivan did not place anything about the complaint in Levengood's personnel file. She merely reported the situation to Horen and Velez. (Defs.Ex. I; Sullivan Depo. at 103.) Nor did she inform Plaintiff or her staff of any disciplinary action that would be taken in response to the alleged conduct. Sullivan refused Plaintiff's request to meet with her. Under the circumstances, it would be reasonable for Plaintiff to believe that her allegations had not been credited. Indeed, rather than clearing the air, an employee in Plaintiff's position might have been left feeling as though she were responsible for the poor working environment.

---

**13.** Alvarez disputes Cuzzi's recollection that he contacted her about Plaintiff's allegations in December. (Alvarez Depo. at 29–30.) The issue of what, if any, report was made to Alvarez before the formal complaint was filed involves questions of credibility.

■ Cuzzi's remedial action consisted of speaking with Plaintiff numerous times as she continued to complain about isolation by Levengood, and attending ATP staff meetings. However, Cuzzi concedes that he told Plaintiff that her complaints were "petty" and that she had to keep trying to seek Levengood's cooperation. Further, Cuzzi also failed to tell Sullivan about Plaintiff's numerous complaints of being undermined and isolated. The mere fact that the harassing statements ceased does not warrant a finding for Defendants as a matter of law, particularly because Plaintiff may have been isolated by Levengood thereafter. *See, e.g., Ott,* 846 F.Supp. at 273 (*prima facie* employer liability established although harassment ceased after supervisors spoke to alleged harasser).

In sum, based upon the above facts construed in a light most favorable to Plaintiff, a factfinder could reasonably conclude that the action taken in response to Plaintiff's claims of sexual harassment was not prompt and effective, and did not dispel the workplace hostility allegedly engendered by Levengood. At a minimum, Plaintiff has established a factual dispute with respect to this issue. Therefore, Defendants are not entitled to judgment as a matter of law on Plaintiff's sexual harassment claim. *See, e.g., Ott,* 846 F.Supp. at 273 (court found that Plaintiff established *prima facie* employer liability, where she immediately complained to her supervisor who then reported the harassment to his supervisor, and both men reprimanded the responsible employee; although no further incidents were reported, Plaintiff testified at her deposition that she believed that her complaint was not taken seriously and the offending employee should have at least been issued a written reprimand); *Watts,* 724 F.Supp. at 107 (denying motion to dismiss where defendant docked pay of one

of harassers and advised him to stay away from the plaintiff, since other allegations might establish that employer "did not come close to 'exhaust[ing] the field of reasonable and feasible actions' it might have taken to cleanse [plaintiff's] working environment.") (quoting *Snell,* 782 F.2d at 1104); *Cf. Donato,* 1994 WL 495791 at *2 (no employer liability where plaintiff only complained of one instance of harassment and soon thereafter, plaintiff reported to the head of personnel department that everything was "back to normal"); *Babcock,* 783 F.Supp. at 809 (where employer immediately investigated plaintiff's complaint, and reprimanded or removed the harassers from the workplace, employer could not be held liable for harassers' actions).[14]

### C. *Retaliation Claims*

Defendants also seek summary judgment on Plaintiff's retaliation claims, arguing that, as a matter of law, Defendants' allegedly retaliatory conduct does not constitute adverse employment action, and Plaintiff cannot establish a causal connection between her participation in activity protected by Title VII and the Defendants' conduct. (Defs.Memo at 40–44; Defs.Reply at 16–17.)

Title VII prohibits an employer from subjecting an employee to an adverse employment action in retaliation for that employee's opposition to allegedly discriminatory conduct. Section 704(a) of the statute, 42 U.S.C. § 2000e–3(a), provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in

---

14. Defendants rely on the same grounds to support a motion for summary judgment under New York law. The language of Section 296 of the New York Executive law is nearly identical to that contained in Title VII. *Brostrom,* 1994 WL 592680 at *9; *Fair,* 742 F.Supp. at 157; *Kersul v. Skulls Angels Inc.,* 130 Misc.2d 345, 347, 495 N.Y.S.2d 886, 888 (Sup.Ct.1985). New York courts require essentially the same standard of proof as that which applies to cases under Title

VII. *Brostrom,* 1994 WL 592680 at *9; *Fair,* 742 F.Supp. at 157; *see also Nicolo v. Citibank New York State,* 147 Misc.2d 111, 113–15, 554 N.Y.S.2d 795, 797–99 (Sup.Ct.1990). For the reasons stated above in connection with Plaintiff's Title VII claim, Defendants' motion for summary judgment on Plaintiff's sexual harassment claim brought under New York State law must also fail.

an investigation, proceeding, or hearing under this subchapter.

 In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that "a retaliatory motive play[ed] a part in adverse employment actions toward an employee. . . ." *Cosgrove,* 9 F.3d at 1039. In determining whether a plaintiff has met this burden, the court considers whether: (1) the plaintiff was engaged in activity protected by Title VII; (2) the employer was aware that the plaintiff participated in the protected activity; (3) the plaintiff suffered from a disadvantageous employment action based upon her activity; and (4) there is a causal connection between the protected activity and the adverse action taken by the employer. *Id.; see also Kotcher,* 957 F.2d at 64.

 In the present action, the record clearly reveals, and the parties do not dispute, that Plaintiff engaged in activities protected by Title VII. Nor is there any dispute that Sullivan, Cuzzi, and Levengood became aware of Plaintiff's discrimination complaints in mid-December of 1991. However, Defendants contend that Plaintiff has failed to tender sufficient evidence to allow a factfinder to reasonably conclude that Plaintiff has satisfied the third and fourth elements of her *prima facie* case.

 With respect to the third element, whether an employer's conduct constitutes an adverse action, a plaintiff must demonstrate that the conduct "affected the terms, privileges, duration, or conditions of the plaintiff's employment." *Vergara v. Bentsen,* 868 F.Supp. 581, 591 (S.D.N.Y.1994) (quoting *Rooney v. Witco Corp.,* 722 F.Supp. 1040, 1046 (S.D.N.Y.1989)). Although retaliatory conduct may include discharging the employee for participating in protected activity, *see Dominic v. Consolidated Edison Co.,* 822 F.2d 1249, 1254 (2d Cir.1987), *Davis v. State Univ. of New York,* 802 F.2d 638, 642 (2d Cir.1986), it may also consist of action less severe than outright discharge. *See, e.g., Cosgrove,* 9 F.3d at 1040 (defendant's failure to follow its own procedures for addressing employee performance deficiencies was adverse action constituting retaliation).

 Plaintiff has introduced evidence that, after she complained about Levengood's conduct, Levengood increasingly isolated her in a variety of ways: he sent her directives to undertake various programs and projects, but refused to communicate with her, which made it impossible for her to perform the assigned projects; he excluded her from senior level meetings that affected her and her staff; and, he undermined her by assigning work to her staff without informing her. (Pl. Ex. Y.) She also received sudden and negative evaluations by Sullivan although she had never experienced a negative performance evaluation at any time in the past. (Dortz Aff. ¶ 24; Dortz Aff.Ex. B.) Moreover, she felt increased supervision by Cuzzi, who began attending ATP staff meetings. (Sullivan Depo. at 138–39; Cuzzi Depo. II at 219–20.) Plaintiff has therefore presented various examples of ways in which Levengood, Cuzzi, and Sullivan's actions disadvantaged, and interfered with, her ability to perform her job, which could support the conclusion that Plaintiff suffered from adverse employment action. *See, e.g., Johnson,* 931 F.2d at 207 (union's failure to proceed with the grievance process on behalf of plaintiff because of plaintiff's administrative complaint constituted adverse employment action); *Dominic,* 822 F.2d at 1254–55 (court viewed employer's acts of deluging plaintiff with clerical work, altering his performance evaluation, and shifting demands and rating periods after plaintiff engaged in protected activity, as adverse employment action); *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir. 1980) (plaintiff union members, were disadvantaged by union's manner of referring persons for work so as to give rise to retaliation); *Vergara,* 868 F.Supp. at 592 (summary judgment inappropriate where parties disputed whether the defendant followed its own evaluation procedures, and whether alleged misstatements and exaggerations about the plaintiff affected the decision to deny plaintiff's request to resume managerial duties); *Linares v. City of White Plains,* 773 F.Supp. 559, 561–62 (S.D.N.Y.1991) (interference with plaintiff's job, isolating him, excluding him from meetings, and pressuring him not to bring a lawsuit were among those

actions that a factfinder could conclude were "adverse", to deny summary judgment).

■ With respect to the fourth element of Plaintiff's *prima facie* case, a causal connection between the adverse action and the protected activity can be established indirectly by showing that the protected activity was followed closely by adverse treatment, or directly through evidence of retaliatory animus directed against the plaintiff. *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111, 115 (2d Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987); *see also Sumner v. United States Postal Service,* 899 F.2d 203, 209 (2d Cir.1990); *Davis,* 802 F.2d at 642.

■ Viewing the evidence in a light most favorable to Plaintiff, a factfinder could reasonably conclude that there was a causal connection between Defendants' actions and Plaintiff's participation in protected activity. The proximity between Plaintiff's complaints and the adverse action, in itself, presents sufficient circumstantial evidence of causation. *See, e.g., Johnson,* 931 F.2d at 208 (showing that the adverse action directly followed the filing of the administrative charge is sufficient to establish the requisite causal connection); *Finley v. Cowles Business Media,* No. 93 Civ. 5051 (PKL), 1994 WL 273336, **3–4 (causal connection established by circumstantial evidence that adverse action occurred a few weeks after ADEA plaintiff indicated on his insurance form that he had a heart condition, and after only about a month on the job); *Ohanessian v. Cannon Design, Inc.,* No. 90 Civ. 1329S, 1992 WL 193690, *7 (W.D.N.Y. July 15, 1992) (adverse action taken two weeks after plaintiff complained to superior, sufficient to establish causation); *Francoeur v. Corroon & Black Co.,* 552 F.Supp. 403, 410 (S.D.N.Y.1982) (approximately one-month period between participation in protected activity and retaliatory act in itself establishes *prima facie* case).

In addition, after Plaintiff filed her EEOC charge, on one of the numerous occasions that she complained to Cuzzi about Levengood's conduct, Cuzzi told Plaintiff that Levengood's behavior "was a direct response to [her] filing the complaint." (Defs.Ex. Y.) This comment may certainly be viewed as circumstantial, if not direct, evidence of retaliatory animus.

■ Notwithstanding the above evidence, Defendants suggest that Plaintiff cannot establish causation because the allegedly retaliatory conduct occurred before Plaintiff filed her EEOC charge. *See* Defs.Memo at 43. To the contrary, it is well-established that "[i]n addition to protecting the filing of formal charges of discrimination, § 704(a)'s opposition clause protects as well informal protests of discriminatory employment practices, including making complaints to management. . . ." *Sumner,* 899 F.2d at 209. *See also Lambert v. Genesee Hosp.,* 10 F.3d 46, 55 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994) ("The phrase 'opposed any practice' encompasses an individual's complaints to supervisors regardless of whether she also files an EEOC charge."); *Kotcher,* 957 F.2d at 65.

Defendants also argue the absence of any nexus between Plaintiff's complaints and the alleged adverse action because Plaintiff made the same complaints of being excluded, isolated, and circumvented before the sexually harassing statements and her complaints about them to Cuzzi. (*See* Defs.Memo at 43; Defs.Reply at 16.) There is some evidence in the record that Plaintiff felt that Levengood shunned her even before she learned of the harassing statements. (*See* Dortz Deposition, dated September 21, 1993 ["Dortz Depo. II]", at 40–41; Dortz Deposition, dated September 30, 1993 ["Dortz Depo. III"], at 77–78.) However, Plaintiff has tendered evidence suggesting that the isolation, undermining, circumvention, and exclusion that she experienced after lodging her complaint grew far more severe. (Defs.Ex. Y; Dortz Aff. ¶ 25.) Viewed in a light most favorable to Plaintiff, this fact suggests that Levengood's more egregious conduct was triggered by Plaintiff's complaints to Cuzzi. In any event, this factual dispute is properly left for determination at trial.

Defendants further argue that Plaintiff cannot establish that any negative evaluations that she received after her complaints were in retaliation for her complaints of discrimination, because individuals were critical

of her performance before she complained about harassment. *See* Defs.Reply at 16. "Evidence of prior dissatisfaction [with an employee's performance] is ... present in virtually every case in which a claim of retaliation is made ... [and the] prohibition of retaliation would thus be meaningless if such evidence precluded a jury from finding retaliation." *Dominic,* 822 F.2d at 1255. In any event, Plaintiff points to evidence that she received favorable performance evaluations before she complained of discrimination. (Dortz Aff. ¶ 24; Cuzzi Depo. II at 166–69.) The question of Plaintiff's performance before she complained of harassment, and whether Sullivan's negative comments about her performance after that time were out of the ordinary, merely presents another factual dispute that cannot be resolved on a motion for summary judgment. In sum, there is sufficient circumstantial evidence to establish the existence of a factual dispute regarding the causation element of Plaintiff's *prima facie* case, so as to preclude summary judgment on Plaintiff's claims of retaliation by her superiors.

▮ There is one aspect of Plaintiff's retaliation claim, however, that focuses on the actions of the Elmhurst Personnel Department, which is far too speculative to satisfy even the *de minimis* showing needed to withstand summary judgment. Plaintiff has not tendered any evidence to support the conclusion that the delay in her receiving medical leave forms constituted adverse retaliatory action. Other than her vague testimony that there was a delay in her receipt of the leave forms, and a paragraph in her complaint alleging that she did not receive proper forms until December of 1991, Plaintiff has offered nothing to suggest that she was harmed by the inconvenience or that she was deprived of any pay for the period during which she was on leave. *See, e.g., McGuire v. United States Postal Service,* 749 F.Supp. 1275, 1282–83 (S.D.N.Y.1990) (employer's delay in providing benefits forms

was not adverse employment action, particularly since the plaintiff still was able to file the forms in a timely manner); *Rooney v. Witco Corp.,* 722 F.Supp. 1040 (S.D.N.Y. 1989) (temporary suspension in payment of plaintiff's benefits not adverse action).

Further, Plaintiff has failed to offer any evidence that would establish that the delay in receiving her forms was traceable to her participation in protected activity. She has not submitted any evidence, other than an unsubstantiated belief, that the individuals with whom she spoke in the Personnel Department even knew about her harassment claim; nor has she submitted any evidence that would suggest that individuals in the Personnel Department had any motivation, particularly retaliatory motivation, to delay in sending her leave forms. *See, e.g., Ricard,* 1993 WL 385129 at *5 (summary judgment granted where plaintiff submitted no evidence that failure to be hired by a new manager was causally connected to her protected activity where there was no evidence that the managers consulted with others in making their decision or that they even knew about the protected activity).

Under the circumstances, Plaintiff's retaliation claim against the Elmhurst Personnel Department is insufficient as a matter of law. I therefore recommend that Defendants' motion for summary judgment on the portion of Plaintiff's retaliation claim regarding the actions of the Elmhurst Personnel Department be granted.[15]

### D. *Constructive Discharge Claim*

▮ Defendants contend that Plaintiff has failed to establish a *prima facie* case of constructive discharge because the remarks made by Levengood, the retaliation Plaintiff suffered, and Defendants' conduct in general, were not severe enough or close enough in time to her resignation to allow a factfinder to reasonably conclude that her working conditions were so intolerable that a reasonable

15. Both parties rely on the same grounds to argue their positions on the basis of New York law. I agree with the proposition that the same standards apply. *See Lambert,* 10 F.3d 46. For the reasons stated above in connection with Plaintiff's Title VII retaliation claim, defendants' motion for summary judgment on Plaintiff's retaliation claim brought under New York State law, against the Elmhurst Personnel Department, should be granted. Defendants' motion for summary judgment on Plaintiff's retaliation claim in all other respects should be denied.

person in Plaintiff's shoes would have felt compelled to resign. (Defs.Memo at 48–51.) Plaintiff contends that she has introduced facts sufficient to defeat summary judgment on this issue. (Pl.Memo at 50–52.)[16]

In order to establish constructive discharge in support of a Title VII claim, a plaintiff must demonstrate that the employer "'deliberately [made the] employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983) (quoting *Young v. Southwestern Savings & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975)). In addressing the issue, the court must consider whether the "'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Id.* at 325 (quoting *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977)). To withstand summary judgment, a plaintiff must tender sufficient evidence to show more than "dissatisf[action] with the nature of [her] assignments.... [or] that the employee feels that the quality of [her] work has been unfairly criticized.... or [that her] working conditions were difficult or unpleasant...." *Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir.1993). *See also Spence v. Maryland Casualty Co.,* 995 F.2d 1147, 1156 (2d Cir.1993). However, when an employee who has suffered from discriminatory conduct is required to engage in daily dealings with her alleged wrongdoer, she may suffer an "aggravated sense of humiliation" giving rise to constructive discharge. *Halbrook v. Reichhold Chems., Inc.,* 735 F.Supp. 121, 126 (S.D.N.Y.1990).

Although the court may ultimately find that Plaintiff has not established by a preponderance of the evidence that she was constructively discharged, I cannot say that her claim is insufficient as a matter of law. Considering the evidence in a light most favorable to Plaintiff, she has met the *de minimis* showing required to withstand summary judgment, and has tendered sufficient evidence to establish a genuine dispute as to this issue. First, as discussed above, Plaintiff established a *prima facie* case of a hostile work environment resulting from sexual harassment, sufficient to withstand summary judgment. Although Levengood isolated her, Plaintiff was still required to reach out to him and interact with him in their small department after he made offensive comments to her as well as to her subordinates and co-workers. Not only did her position require such contact, but Cuzzi specifically instructed Plaintiff to make a concerted effort to reach out to Levengood. Whether a reasonable person might find this environment so unpleasant and difficult that she would feel compelled to resign is a factual question properly left for trial, *see, e.g., Barbetta,* 669 F.Supp. at 572 (evidence of hostile and sexually offensive work environment which reasonable woman in plaintiff's posi-

---

**16.** Plaintiff also argues that the constructive discharge framework is inapplicable to her case, since she did not choose to resign but became medically incapable of working because of Defendants' actions. (Pl.Memo at 48–50.) Plaintiff relies on *Townsend v. Indiana University,* 995 F.2d 691, 692–93 (7th Cir.1993), in which the Seventh Circuit held that the plaintiff, who was on unpaid medical leave and had not resigned, had adequately pleaded a cause of action for lost wages for the time on unpaid leave, since Title VII "does not key the plaintiff's rights to termination, but to discrimination...." The critical factor in *Townsend* was that the plaintiff claimed damages as a result of having been forced to take unpaid leave rather than resign, which is distinguishable from the present action. Indeed, the Seventh Circuit subsequently indicated that *Townsend* did not displace the traditional constructive discharge analysis. *See Carr v. Allison Gas Turbine Division, General Motors Corp.,* 32 F.3d 1007, 1011–12 (7th Cir.1994) ("To obtain a remedy for constructive discharge, all [plaintiff] had to show was that the discrimination to which she was subjected was sufficiently serious to cause a reasonable person to quit.") (citing *Townsend,* 995 F.2d at 693). Moreover, neither the courts in this or any other circuit have found it necessary to rely upon *Townsend.* In *Spence v. Maryland Casualty Co.,* 995 F.2d 1147 (2d Cir. 1993), the Second Circuit employed a constructive discharge analysis, requiring that the employer intend to make the plaintiff's conditions intolerable, when the plaintiff claimed that he was required to take a disability leave for high blood pressure prior to his resignation, allegedly due to the defendant's discriminatory conduct. To the extent that the Seventh Circuit rule does not require employer intent to establish a constructive discharge, it is at odds with the approach in this circuit. For these reasons, I decline to employ Plaintiff's alternative approach in addressing this issue.

tion could have found intolerable was sufficient to defeat summary judgment on constructive discharge claim), particularly because much of Levengood's criticism was not directed toward Plaintiff's job performance but was gratuitous and sexually degrading. *Compare Spence*, 995 F.2d at 1156–58.

Moreover, a factfinder may conclude that, even after Levengood stopped making harassing comments, Plaintiff's working conditions became increasingly difficult: she was confronted with Levengood's refusal to answer her memoranda or phone calls, thereby making it difficult for her to perform the projects he assigned to her; Levengood undermined her authority with her staff, allegedly in retaliation for her complaints; Cuzzi and Sullivan's responses, or lack thereof, made Plaintiff feel as though she was being "gaslighted." In addition, Sullivan's refusal to meet with Plaintiff to discuss any remedial action or address her concerns about the deteriorating working conditions made Plaintiff feel as though there was no hope for improvement. *Compare Watts*, 724 F.Supp. at 109 (no constructive discharge where employer sought to prevent plaintiff's resignation by granting her request to change her class assignment at police academy after employer had failed to respond to her complaints of sexual harassment by dispelling workplace hostility).

In addition, there are certain statements in the record that could be viewed as evidencing an intent on Defendants' part to create intolerable working conditions. For example, when Levengood arrived on the job, he remarked to another social worker, "If something happens to Cynthia, would you want her job?" Further, Cuzzi warned Plaintiff that if she filed an EEOC complaint, "there would be no way" that the she and Levengood could work together. (Dortz Aff. ¶ 19.) Cuzzi's comment may be viewed as evidence that Plaintiff's working conditions might become so difficult that she would not be able to continue in her position if she pursued her grievances. *See, e.g., Lopez*, 831 F.2d at 1188.

 Defendants' argument that Plaintiff's resignation was too distant in time from the harassment is open to challenge. "[T]he passage of time [prior to resignation] is not dispositive. A constructive discharge need not follow immediately upon the heels of an offensive incident." *Barbetta*, 669 F.Supp. at 572. The inference, if any, to be drawn from the fact that Plaintiff took her medical leave in May—on the heels of the retaliatory conduct, but months after the last harassing comment—is properly left to the finder of fact. *Id.* (in denying summary judgment, court stated that plaintiff's continued employment for four months after last incident of sexual harassment "could be seen as a tribute to her perseverance rather than as a bar to relief. . . ."). In any event, I do not view it as significant that Plaintiff waited to resign until she had been on leave for seven months, since an appropriate point of reference as to a constructive discharge may be when a medical leave prior to resignation is taken, rather than the actual date of resignation. *Accord Spence*, 995 F.2d at 1158 (court looked at point that plaintiff took medical leave in finding that plaintiff's resignation was not related to discrimination, where plaintiff failed to proffer any evidence of arguably intolerable working conditions for at least six months before taking disability leave and there was no dispute that employer attempted to accommodate his health problems thereafter).

In sum, Plaintiff's evidence of sexual harassment and retaliation by Levengood, combined with Levengood's statement suggesting that he wanted to force her out of her position, and followed by Defendants' failure to address Plaintiff's concerns about the harassment and her deteriorating work conditions, preclude a finding that Plaintiff's claim of constructive discharge is insufficient as a matter of law. *See, e.g., Minetos v. City Univ. of New York*, 875 F.Supp. 1046, 1052 (S.D.N.Y.1995) (sufficient evidence of constructive discharge was found to preclude summary judgment where two defendants made racial slurs in plaintiff's presence, said she was "too old for the job," and she was denied promotion to head secretary, which was contrary to the employer's custom); *Kirsch v. Fleet Street, Ltd.*, No. 92 Civ. 932 (JFK), 1993 WL 454240, *5 (S.D.N.Y. Nov. 1, 1993) (plaintiff "alleges facts sufficient to give rise to a finding of constructive discharge

including, but not limited to, two consecutive substantial reductions in salary, reassignment of a major account, and age-based discriminatory comments. [Defendant] disputes these facts. It is not the job of the Court to resolve disputed issues of fact—rather, the Court should assess whether there are any factual issues to be tried.... Clearly, there are factual issues to be tried....); *Halbrook*, 735 F.Supp. at 128 (taken together, plaintiffs allegations that her responsibilities were significantly changed or reduced, that she suffered humiliation and embarrassment over losing a promotion to someone she trained and with whom she would be required to interact, and that the failure to promote her effectively ended her opportunities for advancement, raised a reasonable inference of constructive discharge to preclude summary judgment). *Compare Spence*, 995 F.2d at 1156–57 (where supervisor was critical of employees in general, plaintiff was given alternative of returning to his position after supervisor had been demoted and before plaintiff brought suit, summary judgment on constructive discharge claim granted); *Stetson*, 995 F.2d at 361–62 (where employee resigned three years after he became dissatisfied with working conditions although conditions did not change over the three years, employer had responded to plaintiff's complaints and given him raises, and supervisor never expressly or impliedly suggested that plaintiff's employment would be terminated, summary judgment on constructive discharge claim should have been granted).

Under the circumstances, I recommend that Defendants' motion for summary judgment be denied on this issue.

### CONCLUSION

For the above reasons, I respectfully recommend that Defendants' motion for summary judgment be denied in all respects except as to Plaintiff's claim of retaliation on the part of the Elmhurst Personnel Department. Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Peter K. Leisure, U.S.D.J., and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Leisure. Failure to file objections on time will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).