**Joseph TREGLIA, Plaintiff,**

v.

**TOWN OF MANLIUS, Defendant,**

**No. 96–CV–960.**

United States District Court,
N.D. New York.

Nov. 8, 2001.

Green & Seifter, P.C., Syracuse, NY (John L. Valentino, of counsel), for Plaintiff.

Hiscock & Barclay, LLP, Syracuse, NY (Alan R. Peterman, of counsel), for defendant.

## BACKGROUND

MUNSON, Senior District Judge.

In 1990, plaintiff was employed as a Sergeant for the Village of Chittenango

Police Department. In December of that year, plaintiff applied for and obtained a position as a road patrol officer with the Town of Manlius Police Department. On April 12, 1996, plaintiff had a new onset seizure disorder or epileptic seizure. His wife telephoned 911 for an ambulance, but before it came, two town of Manlius police officers arrived to assist the couple. En route to the hospital, plaintiff suffered a second seizure. He has not been subject to any further seizures since that time.

On April 16, 1996, plaintiff returned to work with his physician's note directed to the Manlius Police Department stating that he could return to light duty, but could not drive or operate heavy equipment without further medical clearance.

Plaintiff asserts in his complaint that he received different treatment when he came back to work. Among other things, he was not permitted to take part in training classes until medical approval was received from his doctor, was assigned more administrative and less investigatory work, and received fewer occasions to work overtime. In the past, when he undertook an investigation and interview, he acted alone. If he was assigned this task now, he would be accompanied by a fellow officer. He further alleges that shortly after he returned to work, the Chief of Police ordered him to return home, even though he provided the Manlius Police Department with ample medical documentation establishing that he was fit to return to unrestricted work, upon his eventual return, he was still treated differently.

In the spring of 1997, two other Manlius police officers were promoted to sergeant even though plaintiff had a higher score on the Civil Service examination for that position. Plaintiff claims that the Chief of Police then advised him that he would not be promoted to the rank of sergeant and suggested that he should retire from police

work and enter another occupation. Plaintiff declined retirement, and a short time later he was assigned to the non-enforcement post of information systems officer.

Plaintiff felt the conduct he was receiving was discriminatory and brought it to the attention of the Police Benevolent Association. He also filed discrimination complaints with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights ("DHR") on April 14, 1997. Shortly after the filing, plaintiff was given an unsatisfactory performance evaluation. This evaluation was inconsistent with his 1995 and 1996 evaluations. In March, 1998, he was required to work on three different shifts when no other officer was required to do so. He was no longer used as a hostage negotiator, permanently assigned to office duties in 1998, and was passed over for promotion to sergeant in March, 1999.

Plaintiff was transferred to road patrol in October 1998, but in January 1999, he was assigned to the night shift. Plaintiff provided the Police Department with a note from his doctor recommending that he only work days. Plaintiff states that the Department balked at this recommendation, and plaintiff was compelled to go on disability. Plaintiff then filed second complaints with the EEOC and the DHR alleging that he had been discriminated and retaliated against by the defendant for filing the complaints of April 14, 1997. After six weeks on disability, plaintiff was returned to the day shift road patrol.

During March, 1999, plaintiff requested dismissal of his two complaints filed with the EEOC and the DHR in order to seek relief in federal court. The EEOC issued right to sue letters on March 23, 1999 and June 10, 1999. The complaint in this action was filed on June 18, 1999, within the 90 day limit for commencing an action

under the terms of the respective right to sue letters.

The complaint in this action was filed on June 18, 1999. It was based on plaintiff's opinion that the defendant had discriminated and thereafter retaliated against him, and set forth causes of action alleging violations of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.;* the Rehabilitation Act of 1973, § 504; the New York State Human Rights Law, ("HRL"), New York Executive Law § 296, *et seq.* (McKinney 1998); and a New York State common law claim for intentional infliction of emotional distress. The relief sought includes declaratory, injunctive and equitable relief, compensatory and general damages, attorneys' fees, costs and disbursements.

On July 27, 1999, defendant brought a motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. By order dated October 21, 1999, this court granted that portion of defendant's motion seeking dismissal of plaintiff's perceived federal and state disability claims and state claim for intentional infliction of emotional distress, and dismissed the complaint as to these claims; that portion of defendant's motion seeking dismissal of plaintiff's federal and state retaliation claims were denied and the court retained jurisdiction thereof.

Currently before the court is defendant's motion for summary pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has entered opposition to the motion.

## DISCUSSION

Rule 56 of the Federal Rules of Civil Procedure permits summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2709, 91 L.Ed.2d 202 (1986). Summary judgment is properly regarded as an integral part of the Federal Rules as a whole, which is designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)(quoting Federal Rule of Civil Procedure 1). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities and draw inferences against the moving party. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)(*per curiam*). An issue of credibility is insufficient to preclude the granting of a motion for summary judgment. Nor will factual disputes that are irrelevant to the disposition of the suit under governing law preclude any entry of summary judgment. *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509. In Title VII retaliation cases, conclusory allegations and statements in affidavits are insufficient to satisfy the requirements of Rule 56. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). "[S]ummary judgment under Rule 56 is still appropriate, indeed mandated, when the evidence is insufficient to support the non-moving party's case." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61 (2d Cir.1998). Summary judgment applies no less to Title VII cases than to commercial cases or other areas of litigation and plaintiff must still offer concrete evidence from which a reasonable juror could return a verdict in that party's favor. *Id.* at 62.

 The ADA forbids retaliation against any person who has asserted rights under the ADA. Unlike a plaintiff in an ADA discrimination case, a plaintiff in a ADA retaliation case need not establish that he is a "qualified individual with

a disability." By its own terms, the ADA protects "any individual" who has made a charge, testified, assisted, or participated in an investigation, proceeding or hearing concerning any act or practice made unlawful by the ADA. 42 U.S.C. § 12203(a). A person still may pursue a retaliation claim under the ADA even if his underlying claim of disability fails. *Mesnick v. General Electric Co.*, 950 F.2d 816, 827 (1st Cir.), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). The ADA incorporates the procedures and enforcement mechanisms of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3(a)(1964), the basic statute prohibiting discrimination in employment. Given this similarity, it is appropriate to apply the framework used in analyzing retaliation claims under Title VII in analyzing a retaliation claim under the ADA. *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.1998). Plaintiff asserts that he was retaliated against for filing administrative grievances and a complaint with the EEOC. He seeks relief under Title VII and the New York State Human Rights Law (Executive Law § 296). Since New York courts require the same standard of proof under the Human Rights Law as those brought under Title VII, the court will exercise its pendant state jurisdiction and address plaintiff's federal and state claims simultaneously. See *Miller Brewing Company v. State Division of Human Rights*, 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489 N.E.2d 745 (1985); *Van Zant v. KLM Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996). Plaintiff claims that the retaliation took place on January 30, 1996 when he was compelled to undertake a heavy-duty job assignment which caused an injury to his left arm.

■ Retaliation claims are evaluated under the burden shifting rules established by the Supreme Court in *McDonnell Douglas v. Green, supra*. A *prima facie* case for retaliation under Title VII requires the plaintiff to show [1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; [3] a causal connection between the protected activity and the adverse employment action. *Kotcher v. Rosa & Sullivan Appliance Center, Inc.*, 957 F.2d 59, 64 (2d Cir.1992). A causal connection can be established indirectly by showing that a protected interest was closely followed in time by adverse action. *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir.1986). Here, plaintiff engaged in a protected activity by filing a discrimination charge with the EEOC shortly after the alleged adverse action began. A plaintiff does not have to show that the conduct he opposed was actually a violation of the statute as long as he can validate that he possess " 'a good faith, reasonable belief that the underlying challenged actions of the employer violated that law.' " *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2nd Cir.1998)(*quoting Manoharan v. Columbia University College of Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir.1988)).

■ The plaintiff's burden at this stage is slight, he may establish a *prima facie* case with *de minimis* evidence. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988). Once the plaintiff has made this presentation, the defendant must demonstrate legitimate reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's reasons are a pretext for the true discriminatory motive. *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991). Under the *McDonnell* process, the court must not only decide whether the proffered reason for the employment decision is a pretext for retaliation, but must be convinced that

there exists no other reasons suggested in the record that may justify the defendant's actions, and that the plaintiff was the victim of retaliation. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 521, 113 S.Ct. 2742, 2754, 125 L.Ed.2d 407 (1993). There is no disagreement that plaintiff engaged in a protected activity when he filed his administrative grievances and EEOC complaints, *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir.1998). Instead, the controversy focuses on whether plaintiff experienced any disadvantaging employment actions and, if so, what causal connection, if any exists between those actions and his protected activities.

 An adverse employment action sufficient to support a retaliation claim is a materially adverse change in the terms, privileges, duration and conditions of employment. McKenney v. New York. *Torres v. Pisano,* 116 F.3d 625, 640 (2d. Cir.1997)(*quoting McKenney v. New York City Off–Track Betting Corp.,* 903 F.Supp. 619, 623 (S.D.N.Y.1995)); *Dortz v. City of New York,* 904 F.Supp. 127, 156 (S.D.N.Y. 1995).

> "[A] material adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A material adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in salary, a less distinguished title, a material loss of benefits, significantly diminished material benefits or other indices that might be unique to a particular situation."

*Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998), *citing, Crady v. Liberty National Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993).

Plaintiff contends, *inter alia,* that his job duties were significantly changed and re-duced to non-enforcement administrative duties following the filing of his administrative and discrimination complaints. Additionally, that he could not work on the police department computers, that he received an unfair and inaccurate evaluation which indicated that his performance was unsatisfactory in specific areas involving judgment, decision making and flexibility which contributed to his not being promoted to sergeant, that he was removed as a hostage investigator, that he was subjected to several unnecessary investigations, was not appointed to a position he sought with the department's emergency service team, was moved from the day shift to the less desirable night shift, and was compelled to accept disability leave.

Due to the number of plaintiff's retaliation charges, the court will consider each charge and defendant's claimed legitimate reasons for its actions, seriatim.

 A district court may hear Title VII claims that are either included in an EEOC charge or are based on conduct that is reasonably related to that alleged in the EEOC charge. *Stewart v. United States Immigration and Naturalization Service,* 762 F.2d 193, 198 (2d Cir.1985). It has been held that retaliation, and certain other charges that may not have been alleged in an EEOC charge, are sufficiently related to the allegation in the EEOC charge and it would be unfair to civil rights plaintiffs to bar such claims in a civil action. *Butts v. City of New York Department of Housing Preservation and Development,* 990 F.2d 1397, 1402 (2d Cir.1993). The exhaustion requirement is loosened for retaliation claims because of the close association between the retaliatory action to both the original discriminatory behavior and the filing of the charge itself. *Owens v. New York City Housing Authority,* 934 F.2d 405, 410–411 (2d Cir.), *cert. denied,* 502 U.S. 964, 112 S.Ct. 431, 116

L.Ed.2d 451 (1991). The court, therefore, has jurisdiction to consider plaintiff's alleged retaliatory events that occurred prior to the filing of his first administrative complaint.

Plaintiff maintains that upon his return to work after his two seizures in April 1996, he received different treatment. He was not permitted to participate in training classes without medical approval from his doctor, was assigned more administrative and less investigatory work, worked less overtime, and was often assigned a fellow officer to accompany him when carrying out an assigned task. Defendant contends that its alleged actions were taken to determine to what extent his seizures and/ or the medication he was taking thereafter, may have on his ability to carry out his duties as a police officer, and, if necessary, make accommodations to assist plaintiff. Under the ADA an employer may require a medical examination and/or inquiry of an employee that is job related and consistent with business activity, and may make inquiries into the employee's ability to preform job-related functions. 29 Code of Federal Regulations § 1630.14(c)

In October 1996, the Manlius Police Chief received a complaint from the Onondaga County District Attorney's Office ("DA's Office") concerning plaintiff's conduct that disrupted an investigation being conducted by the Onondaga County Sheriff's Department Abused Persons Unit ("APU"). Plaintiff claims these charges were unfounded. The Manlius Police Department and the APU had agreed to collaborate in investigating certain sex offenses that had taken place in the Town of Manlius. Plaintiff was supposed to act as a liaison officer between the two Departments. The DA's Office complained that plaintiff was interfering with the investigation although Chief Capria had ordered him removed from the case, and to stay clear of any suspects and APU investigators. Plaintiff had not listened to the District Attorney's advice on the case, he appeared at a suspect's arraignment, requested copies of investigative materials and argued with APU officers about the way they were conducting the investigation. The DA's Office felt plaintiff's actions would ruin sensitive and critical investigations, and possibly expose the Manlius Police Department to legal action.

Defendant conducted an investigation into the matter and a Notice of Discipline was issued to plaintiff stating that two of the four specifications were supported and two were not. Subsequent negotiations between defendant and the Town of Manlius Police Benevolent Association ("Manlius PBA") resulted in plaintiff getting a written reprimand in full satisfaction of the Notice of Discipline.

Plaintiff cites three internal investigations he was subjected to in March 1997, as further retaliatory conduct by defendant. Defendant was compelled to make these investigations because they resulted from complaints from private citizens. When the investigations were concluded, plaintiff was found blameless in each complaint.

Internal charges were again filed against plaintiff in September 1998. Early in the morning of Labor Day, September 8, 1998, the Town of Manlius was hit with a devastating wind and rain storm that caused catastrophic damage to real and personal property in Manlius and throughout Onondaga County. Both Manlius and Onondaga County declared a State of Emergency. Every officer in the defendant police department reported for duty early the next morning except plaintiff. When contacted at his home and was told

to report for duty, he refused to do so. He also refused to report for duty the following day until directly ordered to by Capt. Bleyle. The investigation based on plaintiff's refusal to report for duty until ordered to do so, resulted in a Notice of Discipline being issued to plaintiff. The Manlius BPA grieved the Notice of Discipline and the grievance was settled with plaintiff accepting a two day suspension.

 Plaintiff alleges that during 1995 and 1996 his supervisors lead him to believe that he was the leading candidate for promotion to fill the next available sergeant position because he had the highest exam mark on the civil service test for sergeant, his 1995 and 1996 performance evaluations rated him overall "above satisfactory," and he had received a commendation for his work in assisting the Department to obtain its national accreditation in April 1996. · Two sergeant positions became available in February 1997. The positions were filled by the promotion of Officers Becker and Zesky. At the time the positions became available, five officers were eligible for promotion to sergeant. Two officers declared that they did not want to be considered for the promotion. Chief Carbery consulted with Captains Bleyle and Marlow as well as former Chief Capria, and reviewed each candidate's personnel file, and reasoned that Officers Becker and Zesky were the best-qualified candidates for promotion. Officer Becker had supervisory experience outside the Department that Chief Carbery thought was superior to plaintiff's supervisory experience. He also thought that Officer Zesky was a very good officer who had an excellent reputation for good judgment and had good rapport with the rank and file within the Department. The Chief was aware of plaintiff's exceptional technical skills, but also knew that he frequently had difficulty following police procedures

and orders, not encouraging characteristics for someone becoming a member of a management team (Carbery aff'd. ¶¶ 13–14, ¶ 22). As part of discovery in this case, plaintiff obtained the personnel files of Officers Becker and Zelsky, but has not exhibited any material from these files indicating that one or both were not qualified for the promotions they received.

In March 1999, Plaintiff again applied for promotion to sergeant. The promotion was given to Officer Cassalia even though plaintiff claims that he was better qualified for the promotion. The promotion recommendation was based on the agreed opinions of Captain Belyle, three sergeants and three officers. The decision may have been effected by fact that shortly before it was made decision plaintiff had been subject to a Notice of Discipline regarding his actions during the Labor Day storm.

In October 1997, plaintiff complained to the NYDHR regarding his failure to be promoted to sergeant. He alleges that when Chief Carbery heard about this he stated to Mike Buzzard, Manlius PBA President "that if plaintiff wanted to pay hardball, we could swing the bat and play hardball too." However, in the affidavit Mike Buzzard made for this proceeding, he states that Chief Carbery made this statement in the context of negotiations to settle the grievance plaintiff filed concerning the discipline he received for refusing to report for duty on the day of the Labor Day storm.

 Plaintiff claims that he was removed as a member of the hostage negotiation team and required to turn in his pager. Captain Bleyle of the Manlius Police Department states that plaintiff was not removed as a member of the hostage negotiation team, and only one of the four team members is issued a pager. The one pager is authorized to the negotiator assigned to the Department of Emergency

Services Team ("EST"). Plaintiff's pager was issued to him in connection with his duties as a Youth Officer. In November 1998, another pager was needed for the Emergency Service team. At that time, plaintiff had been transferred to Road Patrol assignment, and was asked to return his pager. Plaintiff remained a member of the hostage negotiation team and received subsequent training in that assignment. Regarding plaintiff's not being appointed to the EST, each candidate was rated by the five team EST members, and each member rated plaintiff last due to his expressed lack of motivation. Chief Carbery accepted the recommendations and did not appoint plaintiff to the EST. (Bleyle Add'd. ¶¶ 67–72, ¶ 77).

█ Plaintiff argues that he was denied access to Department computers. Chief Carbery had instituted a program of rotating officers through various assignments within the department to broaden each officer's capabilities and experiences. In March 1997, Chief Carbery created the Informational Services Officer ("ISO") position. It was established to implement increased computerization within the Department. The officer holding the ISO post was to split three days in Administration and three days in Operations on road patrol. Due to the fact that plaintiff holds a Masters Degree in Information Management and had extensive experience in computers and computer programing, and the other officers indicating interest in the position did not, the Chief thought he was the best qualified to assume the position. Plaintiff was not attracted to the this work assignment because he felt a part-time road assignment was a demotion. The Chief advised him that he considered road patrol the Department's most important function and that the other official and civilian positions within the Department existed to support the ISO position.

The Chief assigned plaintiff to the ISO position and other officers were rotated and transferred to other Departmental positions. As it turned out the ISO was a full time position and plaintiff did not have to work road patrol. In October 1998, as part of the regular rotation of officers through different responsibilities, and plans to have civilians undertake computer maintenance, plaintiff was transferred from ISO to road patrol.

█ In March 1998, plaintiff avers that Captain Bleyle made shift assignments which required him to work all three watches during that month, but no other officers had to do so. Plaintiff had been temporarily assigned from Administrative/Information Services to Operations Division—C Watch from March 2 through March 5, replacing an injured officer, he worked the A Watch from March 9 to March 21, due to a personnel vacancy and an officer being assigned to attend a two week Evidence Technician course. He then returned to his Administrative assignment. Assigning plaintiff to C and A Watch meant that all his patrol work would be during the day with no evening or night patrols. Under this work arrangement he received had two more days off than he would have had in his Administrative assignment.

█ Lastly, plaintiff postulates in January 1999, a vacancy opened in A Watch and Captain Bleyle posted a notice for volunteers to transfer to fill it. There were no volunteers, so the Captain asked Sergeant Becker of B Watch to suggest an officer for transfer, and that absent any Departmental need, seniority would govern the assignment. The Sergeant selected plaintiff because he was the only B Watch officer not involved in working a Community–Oriented Policing post, a relief post or a traffic enforcement assignment. Lieut. Barry, noting that plaintiff

was the least senior officer on B Watch, concurred with this recommendation, Chief Carbery accepted it, and plaintiff was transferred to A Watch. Shortly before the transfer was to take place, Captain Marlowe received a letter from plaintiff's physician requesting that no change be made in plaintiff's schedule. In a following letter, the doctor informed the Department that he was making changes in plaintiff's medication regimen and advised plaintiff to maintain a night-sleep and day-work pattern for four weeks. This letter was the first formal notification the Department receives that plaintiff was taking medicine for his new onset disorder. The Department acceded to the doctor's request and plaintiff remained on B Watch for another four weeks.

In mid-March 1999, another letter was received from the doctor stating that changes were still being made in plaintiff's medication regimen and he should be kept on his current work schedule through November 1, 1999. This continuation of plaintiff's restrictive work schedule caused concern in the Department about plaintiff's fitness for duty for police work. Officers are expected to be able to work all three watches if required, and plaintiff had done so less than a year before without any problem. Plaintiff's restriction was beginning to have an adverse effect on the Department. Captain Marlow informed plaintiff that before he began to work the A Watch, he had to provide medical verification from his doctor that he was clear for duty on that watch. On April 1, 2001, Captain Marlow told plaintiff that the Department had no positions available that would fit into his doctor's restricted work schedule, but he would be given full consideration if one became available. In a letter dated April 7, 1999, the Department requested plaintiff's doctor to certify that plaintiff's medical condition would not prevent him from carrying out the essential duties of a police officer. The doctor did so, but the letter also stated that he was advising to maintain the night-sleep day-work pattern of B Watch. The Department then informed plaintiff that if he could not work the night shift, he would be placed on disability. Plaintiff was temporarily placed on disability. He was later re assigned to B Watch even though it required that two other officers be reassigned to permit plaintiff to work the B Watch.

Defendant has proffered legitimate explanations for its actions. Plaintiff has proffered no admissible evidence that defendant's stated explanations are pretextual The continuing retaliatory actions alleged by plaintiff appear to be nothing more than decisions concerning work assignments, administrative matters and Departmental procedures. Such decisions might seem extremely significant to the plaintiff, but, nevertheless the alleged harms suffered by the plaintiff do not rise to the level of Title VII violations.

■■■ "Not everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor events and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir.1996).

Plaintiff failed to establish any acts of retaliation, and, in fact, he is still a member of the Manlius Police Department.

Accordingly, defendant's summary judgment motion is **GRANTED** and the complaint is **DISMISSED**.

**IT IS SO ORDERED.**